**GEORGE HYMAN CONSTRUCTION COMPANY, Appellant,**

v.

**The UNITED STATES, Appellee.**

**No. 87–1164.**

United States Court of Appeals, Federal Circuit.

Oct. 21, 1987.

---

| Caissons Dia. (in.) | Est. Quan. (Lin. Ft.) | Price Per Linear Foot |
|---|---|---|
| 72 | 800 | $ 157.00 |
| 66 | 1370 | $ 136.00 |
| 60 | 2250 | $ 115.00 |
| 46 | 700 | $ 85.00 |
| 36 | 1200 | $ 67.00 |
| CASINGS LEFT IN PLACE | Est. Quan. (pounds) | Price per pound |
| | 75,000 | $ 0.38 |
| ROCK EXCAVATION (CAISSONS ONLY) | Est. Quan. (cu. yds.) | Price per Cubic Yard |
| | 50 | $ 1,200.00 |

Andrew J. Reinhardt, of Sanders, Schnabel & Brandenburg, Washington, D.C., argued, for appellant. With him on the brief were Robert V. Schnabel and Andrew R. McCorkle, of Sanders, Schnabel & Brandenburg, Washington, D.C.

Frank B. Flink, Jr., of the Commercial Litigation Branch, Department of Justice, Washington, D.C., argued, for appellee. With him on the brief, were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, and Mary Mitchelson, Asst. Director. Of counsel was Larry Harrington, of the General Services Administration, Denver, Colo.

Before DAVIS, Circuit Judge, SKELTON, Senior Circuit Judge, and NEWMAN, Circuit Judge.

SKELTON, Senior Circuit Judge.

This is a suit by the George Hyman Construction Company (appellant or Hyman) against the Government to recover $1,622,028 that it claims the Government owes it and its subcontractor, Dominion Caisson Corporation, on a contract awarded to Hyman on April 25, 1984, for foundation work for the construction of an expansion structure for the headquarters building of the Central Intelligence Agency (CIA) in Langley, Virginia. All work other than caisson excavations was to be done by Hyman for the fixed price of $14,189,930. The caisson work was to be done for the following unit prices:

Hyman based its bid for the caisson work on the bid to it for that work by Dominion Caisson Corporation, which became its caisson subcontractor. This appeal is brought by Hyman on behalf of Dominion. The subcontract was awarded to Dominion on August 14, 1984, at Dominion's unit prices and an estimated price of $415,000. The estimated price of the subcontract with Dominion is Dominion's unit prices multiplied by the estimated quantities in the solicitation. Dominion's unit price for rock excavation was lower than all but one of the seven bids to appellant by prospective excavation subcontractors. Aside from one of $2,700, they ranged from $800 to $1,650. Hyman's unit prices to the Government were substantially higher than Dominion's bid to Hyman. We refer to the acts of Dominion in this case as being those of Hyman. When we refer to Hyman, we also refer to Dominion where applicable.

Prior to the submission of bids, a Government consulting firm named Dames & Moore conducted a site investigation of the area where the work was to be done and prepared a report (the D & M report) dated August 23, 1983, and amended August 25, 1983, that was made a part of the specifications for the use of the bidders. The report covered the site surface and subsurface conditions, with a subsurface profile, which is described below, including rock corings, boring logs, recommendations for excavations and other data. Pertinent portions of this report are as follows:

REGIONAL

The CIA complex is located in the Virginia Piedmont, a physiographic province characterized by deformed bedrock, primarily of igneous and metamorphic origin. These crystalline rocks are com-

posed of granite, schist, metasedimentary, metaigneous and metavolcanic rock types. The bedrock surface is somewhat irregular and usually covered by a thick zone of weathered residual material, called saprolite. Saprolite is a product of chemical weathering of the bedrock, displays the same structure as the rock, and may include zones of fairly solid rock. Almost the entire site is covered with between 10 and 50 feet of micaceous silty saprolite....

\* \* \* \* \* \*

To characterize the engineering suitability of the site for the proposed expansion, [the] Dames & Moore [report] developed a generalized profile of subsurface materials which reflects the variable nature of saprolite. The profile consists of four idealized strata (Zones A through D) as discussed below.

ZONE A—Zone A is characterized as massive, or, in some instances, slightly structured saprolite and consists of residual soil that lacks clear definition of such visible primary rock features as foliation, jointing, and crystal structure. The massive saprolite is typically 10 to 15 feet thick. Zone A is thin or absent in some areas due to previous construction.

\* \* \* \* \* \*

ZONE B—Zone B is characterized as structured saprolite and consists of materials with clearly visible indications of primary bedrock features. Zone B soils are typically mottled brown, light brown, orange-brown or gray-brown in color and consist mainly of sand, with some silt and trace quantities of clay. Coarse sand and gravel-size rock fragments also are present. Some samples also are micaceous.

ZONE C—Zone C forms a transition zone wherein the subsurface materials grade from the well-structured saprolite of Zone B to the relatively sound bedrock of Zone D. As in the soils of Zone B, the material which constitutes Zone C has the primary characteristics of the parent bedrock. The principal criterion used to establish the surface of Zone C was the increased resistance to penetration encountered by the soil sampler. Zone C is characterized as that material which is so dense that 100 blows or more are generally required to advance the standard split spoon or the Dames & Moore sampler a distance of 3 inches. This criterion is adequate to effectively delineate the workable saprolite, i.e., Zone A and Zone B, from the underlying and much less workable (i.e., more difficult excavation) saprolite of Zone C.

ZONE D—Zone D represents the relatively sound bedrock. During the field investigation, bedrock was generally considered to be that material which could not be effectively sampled with conventional soil samplers and required rock coring equipment. The bedrock, in addition, was considered to be relatively sound if the coring operation resulted in a recovery rate of approximately 70 percent. The elevation of the bedrock surface was extrapolated after a review of rock core samples.

In addition to the above surface and subsurface information of the site, the Dames & Moore report contained a number of comments and recommendations relative to the building foundations and caisson foundation excavations that are relevant to the case. Pertinent portions are as follows:

This proposed main building expansion will have relatively heavy foundation loadings and restrictions on allowable differential settlement. Additionally, the thickness of soil overlying relatively incompressible bedrock increases significantly from south to north across the expansion area. For these reasons, we are recommending that all foundations supporting major loads be extended to the Zone D bedrock underlying the site, principally for control of differential settlement.

\* \* \* \* \* \*

Based on the results of our study, we believe that foundation support for the main building expansion can best be provided by a combination of drilled piers extending to sound bedrock and spread footings founded upon the sound bedrock where it occurs within a few feet of the

proposed basement floor elevation. This system will provide positive settlement control, which we understand to be of prime concern, as well as high load-carrying capacity. However, it may be possible to accommodate in the structural design the higher settlements incurred with a less costly spread footing or mat foundation system. Design data for these systems are therefore also presented.

Pier Foundations—We recommend that drilled piers be founded on sound bedrock, identified as Zone D in the attached boring logs and subsurface profiles. Piers established on this material can be proportioned using an allowable bearing capacity of 30 tons per square foot.

\*     \*     \*     \*     \*     \*

Sound bedrock that can develop the recommended bearing capacity is identified as Zone D in the attached boring logs and subsurface sections. Bedrock surface elevations are also summarized in Table A–1 in the appendix to this report.

\*     \*     \*     \*     \*     \*

Zone A and Zone B soils will have similar excavation characteristics. They can be removed without difficulty using conventional construction equipment such as backhoes and front-end loaders. The excavation characteristics of the Zone C transition material are expected to be variable, and generally more difficult than the upper zones. The upper boundary of Zone C soils as shown on the boring logs and subsurface sections is our best estimate based on the relatively small samples obtained from the exploration borings. *Zone D excavation will require blasting, supplemented by specialized equipment such as a backhoe-mounted hydraulic impact breaker. Zone D material should be disposed of offsite.* As the Zone C and D boundaries given on the boring logs (Plates A–1 through A–56) can be used by bidders for estimating purposes, we recommend that bidders prepare their own final quantity estimates and interpretations of excavating conditions.

(Emphasis Supplied).

We have quoted extensively from the D & M report, because it bears directly on the controversy in this case as to the caisson excavation work Hyman was required to do, including location, depth and size of each excavation, material to be excavated and the machinery to be used. The report also indicates the knowledge Hyman had of these factors at the time it submitted its bid.

The contract between the parties specified the type of equipment to be used in performing the caisson excavation work as follows:

Equipment for drilling or augering to bedrock shall be of the type suitable for the work and in first class operating condition. The drilling or augering machine shall be sufficient size and capacity to advance the shaft through all layers of materials encountered including weathered fractured rock overlying sound bedrock, at Zone D as defined in Dames and Moore geotechnical report dated July 29, 1983.

\*     \*     \*     \*     \*     \*

Drilling machine shall be one of the following or as approved by the contracting officer:

Caldwell drills, model series 200.
Hughes diggers, model CLIDH.
W.J. Sales Engineering, model SS 8487, double unit.

Equipment specified or implied above are considered to be minimum requirements to provide adequate caisson installation.

Specifications of the contract dealing with the excavation for and construction of the caissons provided:

Caisson Excavation:

Drill shafts of design diameters from excavated ground level to Zone D bedrock except in the parking deck where they will be excavated to depth indicated. Install casing the depth of the shaft where required for protection against cave-ins and water.

\*     \*     \*     \*     \*     \*

Caisson shall be straight shaft extended to bedrock except in the parking deck where they will be extended to depths indicated on the drawings.

The contract also provided that once a caisson had been excavated to proposed Zone D bearing solid bedrock an additional two-inch diameter test hole was required to be drilled five feet deep in the solid bedrock. If any voids, unsoundness or weak stratum were found, further excavation of the bedrock five feet below the weak stratum was required. This provision stated:

Caissons at Bedrock:

After the caisson has been excavated, drill a two-inch diameter test hole, five feet deep into proposed bearing bedrock, using a pneumatic hammer. Record the rate of drilling per foot. The test hole will be checked by the geotechnical engineer or his authorized representative using a probe (furnished by the contractor) made from a No. 4 or No. 5 reinforcing bar, with the end flattened to a sharp edge and bent to 90.

If the probe shows voids, unsoundness or weak stratum within the five feet, extend the caisson below the unsuitable stratum. Repeat this process until a minimum of five feet thick layer of acceptable bedrock is encountered.

The contract provided that the lump sum contract price did not include caissons, payment for which would be made in accordance with the unit price bid.

Finally, the contract defines the unit price per cubic yard of Zone D rock excavation as follows:

Unit price per cubic yard of Zone D rock excavation shall include all costs of drilling and cleaning only. Preparation of approved bearing surface is included under caisson unit price. Rock is defined as the stratum where the approved drill rig with heavy duty auger cannot advance the shaft excavation more than 6 inches per minute. Obstructions such as boulders that are encountered which cannot be penetrated under the same drilling criteria, using the same drill rig and auger, shall be removed and paid for as rock excavation.

After Hyman's low bid was accepted and the contract documents (Contract No. GS–118–19068) were signed, it began the caisson excavation work by drilling with what is known as a heavy duty *earth* auger and proceeded through Zones A, B and into C (defined in the D & M report) to a point where its *earth* auger could not advance downward more than six inches per minute. It then switched the drilling equipment to a heavy duty *rock* auger and continued drilling until Zone D solid bedrock was reached where the heavy duty rock auger could no longer advance more than six inches per minute. Hyman then contended that it removed 1351.49 cubic yards of material between the time the earth auger slowed to six inches per minute and the time the rock auger slowed to the same rate. All of this material was removed above the Zone D solid bedrock stratum. Hyman claimed it should be paid an additional $1200 per cubic yard or $1,622,028 for removal of this material. It submitted a claim to the contracting officer, who denied it on April 3, 1985. Thereafter, it appealed from this decision to the General Services Board of Contract Appeals (GSBCA or the Board) pursuant to the Contract Disputes Act, 41 U.S.C. §§ 601–612. The Board docketed the case as GSBCA No. 7913 and held a hearing. The Board rejected Hyman's arguments and denied its appeal. It then appealed to this court.

Before the Board, Hyman contended, and contends here, that in the definition of "rock" contained in the Zone D rock excavation paragraph of the contract the term "heavy duty auger" means heavy duty *earth* auger, and that it should be paid the rock excavation rate ($1200 per cubic yard) for all material excavated after the heavy duty *earth* auger refused to advance the shaft excavation more than six inches per minute. The Government argued before the Board, and argues here, that the term "heavy duty auger" includes *all* augers, including heavy duty rock augers, and that Hyman was not entitled to be paid the rock excavation rate until its heavy duty *rock* auger refused to advance the shaft excavation more than six inches per minute.

The Board interpreted the contract clause in question in favor of the Government by holding that the plain language of the clause supported the Government's position, and that such interpretation was consistent with the other clauses of the contract. The Board refused to find that in the excavation trade "auger" means *earth* auger unless *rock* auger is specified, although Hyman produced a number of excavation contractors who so testified. The Board held specifically:

"Auger" is a generic term, and we see no reason why it ought not to cover all augers in the absence of a specific statement to the contrary.

The Board pointed out and found that the parties are in agreement that it is customary for an excavation contractor, working in conditions such as those expected and encountered at this site, to begin with an earth auger and switch to a rock auger when the earth auger encounters resistance. It is undisputed that Hyman removed a total of 66.49 cubic yards of rock after its heavy duty *rock* auger had slowed to six inches per minute or less, and that it was paid the rock excavation rate of $1200 per cubic yard for this rock excavation.

Finally the Board held:

Under the terms of this contract, as long as the contractor can advance the shaft excavation more than 6 inches per minute with any sort of heavy duty auger on the approved drill rig, it cannot say it has encountered rock as the contract defines rock. Even if it is using a rock auger, it is not excavating rock for payment purpose.

\*    \*    \*    \*    \*    \*

... what the Government meant by "rock" is a stratum that not even a rock auger can penetrate.

\*    \*    \*    \*    \*    \*

... the only stratum in which the contractor is expected to perform work for which it will receive a unit price per cubic yard is Zone D rock. .... Since Zone D is defined in the soils report, which is part of the specifications, as bedrock, Zone D is where even a rock auger can

be expected to slow below six inches penetration per minute. It necessarily follows that the definition of "rock" ... relates to Zone D bedrock and requires use of a rock auger before the contractor will be paid for rock excavation at the unit price.

We are in general agreement with the findings and conclusions of the Board and have concluded that its decision should be affirmed. The case is before us pursuant to the Contract Disputes Act, 41 U.S.C. §§ 601–612. Under the Act, the Board's findings of fact are final, and this court's review is limited to a determination whether those findings are arbitrary, capricious, based upon less than substantial evidence, or rendered in bad faith. 41 U.S.C. § 609(b) (1982); *American Electronic Laboratories, Inc. v. United States*, 774 F.2d 1110, 1112 (Fed.Cir.1985). We hold that the findings of the Board are supported by substantial evidence, and are neither arbitrary, capricious, or rendered in bad faith.

It is significant in this case that both Hyman and the Government agree that the contract is unambiguous. It is well established that where, as here, the provisions of a contract are phrased in clear and unambiguous language, "the words of those provisions must be given their plain and ordinary meaning by the court in defining the rights and obligations of the parties...." *Elden v. United States*, 617 F.2d 254, 260–261 (Ct.Cl.1980); *accord American Science and Engineering Inc. v. United States*, 663 F.2d 82, 88 (Ct.Cl.1981). It is our task to interpret the provisions of the unambiguous contract before us so that the words of those provisions are given their plain and ordinary meaning. The interpretation of a contract is a legal issue reserved for decision by the court.

The main controversy in this case arises out of the different interpretations of the parties of the following paragraph of the contract, especially the first and third sentences which are underlined below. The paragraph is quoted here again for emphasis.

*Unit prices per cubic yard of Zone D rock excavation shall include all costs*

*of drilling and cleaning only.* Preparation of approved bearing surface is included under caisson unit price. *Rock is defined as the stratum where the approved drill rig with heavy duty auger cannot advance the shaft excavation more than 6 inches per minute.* Obstructions such as boulders that are encountered which cannot be penetrated under the same drilling criteria, using the same drill rig and auger, shall be removed and paid for as rock excavation. (Emphasis Supplied).

The literal, plain and ordinary meaning of these provisions is that they apply only to excavations and removals of boulders and Zone D rock. The term "rock" as expressed in the contract means the stratum of Zone D solid bedrock where a heavy duty auger (earth or rock) cannot advance the shaft excavation more than six inches per minute. The term "heavy duty auger" as stated in the contract means any kind of heavy duty auger (earth or rock). Both the earth and rock auger use the same drill rig. The main difference between them is that the rock auger has longer, tougher and sharper teeth, which are easily attached to an earth auger. Neither the earth auger nor the rock auger is capable of advancing the shaft into the Zone D solid bedrock more than six inches per minute.

This interpretation is consistent with the other provisions of the contract. Hyman was put on notice at least six times in the portions of the D & M report quoted above that the caisson excavations had to be made down to Zone D solid bedrock. Many provisions of the contract specifications quoted above also required Hyman to extend the caisson excavations down to Zone D solid bedrock. Furthermore, a provision of the contract quoted above required it to use suitable and sufficient drilling and augering equipment necessary to advance the shaft to Zone D sound bedrock. Specifically, this provision stated among other things that "the drilling or augering machine shall be [of] sufficient size and capacity to advance the shaft through all layers of materials encountered including weathered and fractured rock overlying sound bedrock, at

Zone D as defined in Dames and Moore geotechnical report dated July 29, 1983."

The plain meaning of these provisions is that Hyman had to drill down to Zone D solid bedrock, and that it had to use heavy duty augers to do so, whether they were earth or rock augers. As it turned out, Hyman first used a heavy duty earth auger to a point in Zone C where it would no longer advance the shaft more than six inches per minute. It then switched to a heavy duty rock auger and finished drilling the shaft down to Zone D solid bedrock where the rock auger would not advance the shaft more than six inches per minute. The record shows that between the point in Zone C where the earth auger was slowed to less than six inches per minute and Zone D solid rock where the rock auger could not advance the shaft more than six inches per minute, Hyman removed 1351.69 cubic yards of material, none of which was excavated Zone D solid rock. According to our interpretation of the contract, it was entitled to be paid for the 1351.69 cubic yards of excavated material on a linear foot basis as set forth in the bid documents and quoted above. However, Hyman contends that it should be paid for this excavated material at the rock excavation rate of $1200 per cubic yard, because it says the excavated material was rock under the definition of that term in the contract. We do not agree.

Hyman bases its claim on its interpretation of the following sentence in the contract: "rock is defined as the stratum where the approved drill rig with heavy duty auger cannot advance the shaft excavation more than six inches per minute." Hyman says the term "heavy duty auger" means heavy duty *earth* auger, and that when its heavy duty earth auger reached a point where it could not advance the shaft more than six inches per minute all material thereafter excavated by its heavy duty rock auger must be considered rock even though none of it was excavated from the solid bedrock in Zone D. It relies on the testimony of several excavation contractors that the custom and usage in the trade is to the effect that when the term "heavy duty auger" is used in a contract without any

further description it means heavy duty *earth* auger. It argues that this custom and usage in the trade should be applied to determine the meaning of the term in the instant case. We must reject this reasoning for several reasons. In the first place, it conflicts with the literal and plain meaning of the contract. In the next place, it would conflict with other provisions of the contract. If we accepted this argument, we would have to rewrite the contract, and insert words the parties never agreed to, which we do not have the authority to do. Also, it is well established that evidence of trade usage and custom cannot be used to vary or contradict the terms of a contract. *WRB Corp. v. United States,* 183 Ct.Cl. 409, 436 (1968); *Astro–Space Labs., Inc. v. United States,* 470 F.2d 1003, 1009 n. 6 (Ct.Cl.1972); *Merando, Inc. v. United States,* 475 F.2d 603, 605 (Ct.Cl.1973); *George Hyman Construction Company v. United States,* 564 F.2d 939, 945 (Ct.Cl. 1977).

Hyman makes the surprising statement in its brief that "the contract did not contemplate any excavation of Zone D rock". The contrary is shown by the D & M report and the contract specifications. Hyman was put on notice in the bid documents that the Government estimated that 50 cubic yards of rock would have to be excavated. The D & M report stated "Zone D excavation will require blasting, supplemented by specialized equipment such as a backhoe-mounted hydraulic impact breaker. Zone D material should be disposed of offsite." Also, the specifications stated that after a caisson had been excavated to Zone D bedrock, the contractor would drill a two-inch test hole five feet deep "into [the] proposed bearing bedrock, using a pneumatic hammer." The test hole would then be checked by a reinforcing bar probe. If the probe showed voids, unsoundness or weak stratum within the five feet, the contractor was required to extend the caisson in the solid bedrock below the unsuitable stratum, and was required to repeat this process of excavating the bedrock until "a minimum of five foot thick layer of acceptable bedrock is encountered." Furthermore, the provision in the contract providing for "unit price per cubic yard of Zone D rock excavation" clearly indicates that Zone D rock excavation was required. The record shows, and the Board found, that Hyman actually excavated 66.49 cubic yards of Zone D rock for which it was paid $1200 per cubic yard.

Hyman has presented an ingenious claim in this case, but it has no substance and is without merit. The claim represents an overrun of 2600 percent on this contract, as found by the Board. An approval of the claim would result in a $1,622,028 windfall for Hyman, which cannot be justified. It is not entitled to recover, and the decision of the Board is affirmed.

AFFIRMED.