**NORTHEASTERN PENNSYLVANIA SHIPPERS COOPERATIVE ASSOCIATION, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 91–1311C.

United States Court of Federal Claims.

Sept. 20, 1994.

Joseph M. Roberts, with whom was Ronald N. Cobert, of counsel, Washington, DC, for plaintiff.

Ross D. Cooper, Washington, DC, with whom was Mary Mitchelson, Asst. Director, David M. Cohen, Director, Commercial Liti-

gation Branch, Civ. Div., and Stuart M. Gerson, Asst. Atty. Gen., U.S. Dept. of Justice, for defendant; John D. Fritz, U.S. Dept. of Defense, Defense Logistics Agency, of counsel.

### OPINION

SMITH, Chief Judge

This case is before the court on defendant's Motion to Dismiss or, in the Alternative, for Judgment on the Pleadings, and plaintiff's Motion for Partial Summary Judgment.[1] Plaintiff seeks recovery in the amount of $2,694,684.98 plus interest for warehousing government freight in connection with its contract to provide transportation services to the United States. Plaintiff alleges that, as a matter of law, it is entitled to judgment based upon the rates listed in Item 41 of the Government Traffic Rules Publication (GTRP) 89–1 or, alternatively, upon a "reasonable rate" pursuant to Item 26(a) of the GTRP. Defendant contends that Items 26 and 41 of the GTRP are inapplicable to plaintiff's storage charges and that this court does not have jurisdiction under the CDA because there exists a specific statutory scheme for resolving disputes such as these. After careful review of the briefs of both parties and after oral argument on this rather complex statutory scheme, the court grants defendant's motion to the extent that it dismisses that portion of plaintiff's complaint that relies on Item 41 and the CDA, and grants plaintiff's motion to the extent that it seeks recovery under Item 26 of the GTRP.

### FACTS

In 1986, plaintiff Northeastern Pennsylvania Shippers Cooperative Association, Inc. (NEPSCA) and the Military Traffic Management Command (MTMC) executed an agreement whereby MTMC became a member of NEPSCA. Effective July 1, 1987, MTMC published its MTMC Freight Traffic Rules Publication No. 1A, which governed the movement of Department of Defense (DOD) general commodity freight traffic by motor carriers, freight forwarders, shipper agents, and shipper associations.

By letter dated November 1, 1988, MTMC solicited bids from carriers for the transport of government freight from the Defense Logistics Agency's (DLA) Mechanicsburg, Pennsylvania depot (Depot) to specific points throughout the United States beginning February 1, 1989. The solicitation letter included as enclosures "Guaranteed Traffic Rules Publication" (GTRP) 89–1 as well as a partially-completed tender format. The tender required that "[t]he property to which rates apply must be shipped by or for the government on (1) government bills of lading; [or on specific types of] commercial bills of lading." *Uniform Tender of Rates And/Or Charges For Transportation Services at* ¶ *21.*[2] Every provision of both the solicitation letter and the tender, except for the actual rates to be inserted by the bidders, had been previously drafted by the government. NEPSCA bid by filing a tender for each region on which it desired to contract and, on December 21, 1988, was awarded the contract. NEPSCA began providing service to Depot February 1, 1989.

Under the terms of the contract, Depot was responsible for loading freight onto trailers provided by NEPSCA. After loading, an in-house contractor hired by Depot was to seal and pull the trailer away from the terminal door. Depot would then notify NEPSCA that the trailer was available for pickup. A NEPSCA driver would arrive at Depot's dispatch office where he would receive bills of lading. The driver could not break the seal while within the Depot compound. The NEPSCA driver would transport the trailer to NEPSCA's terminal where NEPSCA personnel would match the freight with the bill of lading.

At times, Depot tendered to NEPSCA trailerloads which contained freight not listed on the bills of lading.[3] At other times not all

---

1. Plaintiff's summary judgment motion addresses only 98 of 120 claims listed in its complaint.

2. The *"Uniform Tender of Rates And/Or Charges For Transportation Services"* is a standard government form used for transportation services.

3. Such freight is known as "overage" freight.

of the freight listed on the bill of lading was contained in the trailer.[4]  Item 43 of the GTRP required NEPSCA to contact appropriate Depot personnel to obtain approval prior to returning any of the freight.

On June 11, 1989, the government terminated NEPSCA as primary carrier.  By letter dated July 24, 1989, Depot requested that NEPSCA deliver all overages still held at NEPSCA's facility at the earliest practical time.  NEPSCA, contending that it could not return the freight without a government bill of lading, did not comply with the government's request.  On May 1, 1990, Depot hired another carrier to pick up the overages still held at the NEPSCA facility and return them to Depot.

Beginning in late June 1990, NEPSCA submitted invoices to Depot claiming storage charges, based on Item 41 of the GTRP, for the overage freight it had held at the NEPSCA facility.  The government forwarded the claims and documents to the General Services Administration (GSA).  The GSA offered to pay 98 of the 120 claims but refused to assess the charges under Item 41.  Instead, the GSA based plaintiff's recovery on the "per shipment minimum charge" set forth in NEPSCA's tender which, the GSA determined, was that rate charged by a public warehouse in the Wilkes–Barre, Pennsylvania area.

As of July 24, 1991 plaintiff and the government had not reached agreement on the amount to be paid on plaintiff's charges.  On that date, plaintiff filed this case seeking to recover, under Item 41 of GTRP 89–1, for all 120 claims plus prejudgment interest.

**4.**  Such freight is called "shortage" freight.

**5.**  In its motion to dismiss defendant states "Indeed, it appears that this Court may exercise jurisdiction pursuant to the Tucker Act because Nepsca has alleged the existence of an express and implied contract with the Government and 31 U.S.C. § 3726 appears to mandate the payment of money upon claims arising out of transportation agreements such as the one at issue here."  Def.'s Brief at 3, n. 2.

**6.**  Indeed, 10 pages of plaintiff's Brief in Opposition to Defendant's Motion to Dismiss addresses the issue of whether this court has jurisdiction

## DISCUSSION

### I.  Contract Disputes Act Jurisdiction

Plaintiff's characterization of this court's subject matter jurisdiction is confusing.  In paragraph one of its complaint plaintiff asserts 28 U.S.C. § 1346(a)(2) as a basis for jurisdiction.  This provision, however, addresses only the jurisdiction of United States district courts and says nothing about the jurisdiction of this court.  Plaintiff also appears to assert the Contract Disputes Act (CDA), 41 U.S.C. § 601, et. seq., as a basis for jurisdiction.  In paragraphs 47 and 48 of its complaint plaintiff refers to the CDA and, in its ad damnum clause, plaintiff requests interest under the Act.

Because of the nature of plaintiff's claim (i.e, a claim for money damages arising from an alleged implied and express contract), the court will assume that plaintiff meant to assert The Tucker Act, 28 U.S.C. § 1491, rather than 28 U.S.C. § 1346(a)(2), as a basis for jurisdiction.  The government does not contest that this is a proper basis for jurisdiction.[5]  The court must also assume, however, that plaintiff intended to rely upon the CDA as an additional jurisdictional basis.[6]  The government contends that this is an inappropriate basis for jurisdiction and requests that the court dismiss that portion of plaintiff's complaint that is based on the CDA.[7]

The government contends that the Contract Disputes Act is inapplicable to this case because Congress has established, in 31 U.S.C. § 3726, a specific statutory scheme for resolving disputes arising out of the purchase of transportation services by the United States.  The government contends that, because this statute is more detailed and

under the CDA.  See Plaintiff's Opp. Brief at 28–38.

**7.**  By contesting only the court's CDA jurisdiction, and not its general jurisdiction under the Tucker Act, the government challenges only the court's ability to award interest in this case, not its ability to provide any monetary relief.  See Jetco, Inc. v. United States, 11 Cl.Ct. 837, 849–52 (1987) (holding that general waiver of sovereign immunity is not enough to hold United States liable for interest; interest payments must be expressly provided for by statute.).

precisely drawn than the Contract Disputes Act, it preempts the Contract Disputes Act.[8]

The court agrees with the government that its Contract Disputes Act jurisdiction is preempted in this case. The Supreme Court has repeatedly found that a statutory remedy is preempted where a more detailed and precisely drawn statute provides a different remedy. *See, e.g., Preiser v. Rodriguez*, 411 U.S. 475, 489, 93 S.Ct. 1827, 1836, 36 L.Ed.2d 439 (1973); *Brown v. General Services Administration*, 425 U.S. 820, 834, 96 S.Ct. 1961, 1968–69, 48 L.Ed.2d 402 (1976). In this case, the Contact Disputes Act provides for administrative review of disputes arising from "express or implied contract[s] ... entered into by an executive agency." 41 U.S.C. § 602(a). The act applies generally to all government contracts; it does not differentiate by type. Section 3726 and its implementing regulations, however, applies specifically to "claims against the United States relating to freight and passenger transportation services." Furthermore, the act provides its own mechanism for review of such claims that is notably different than that provided in the CDA.[9] Accordingly, this court can not grant relief under the CDA in this case.

## II. Item 41

Item 41 of the Guaranteed Traffic Rules Publication No. 89–1 states in relevant part:

Item 41—*Storage* (Applicable only to shipments requiring prearranged scheduling of vehicle arrival for unloading as indicated in Item 40).

Undelivered freight held in carrier's possession because of consignee's refusal or inability to accept it, and through no fault of the carrier, will be considered stored and will be subject to the following provisions ...

c. Storage charges on freight stored in carrier's possession will be subject to the following *MAXIMUM CHARGES* (pre shipment, or per vehicle, if more than one vehicle is used to transport the shipment):

1. For the first 24 hours or fraction thereof.... $40.00

2. For the second 24 hours or fraction thereof.... $55.00

3. For the third and each succeeding 24 hours, or fraction thereof.... $75.00

Item 40 states:

Item 40—*Prearranged Scheduling of Vehicle for Unloading*

a. Carriers will, at no additional charge, prearrange delivery schedules with designated consignee, for arrival of vehicles or unloading shipments.

b. All shipments must be scheduled for arrival and unloading, when so annotated on bill of lading. This may be accomplished by telephone contact with designated consignee.

■ Plaintiff claims that the GSA erred in refusing to apply the rates above to the storage services it provided to the government during the period at issue. Plaintiff contends that, not only are the Item 41 rates

---

8. In its initial brief, the government relies upon the fact that its agreement with plaintiff was entered into pursuant to Section 10701 of the Interstate Commerce Act (ICA), *see Def.'s Brief at 15–17*, in support of its position that 31 U.S.C. § 3726 preempts the CDA. In response to plaintiff's assertion that the contract was not entered into pursuant to the Interstate Commerce Act, defendant asserts that 31 U.S.C. § 3726 and its implementing regulations apply "to *all* claims against the United States by *any* organization providing transportation services to the Government." *Def.'s Reply Brief at 17 (emphasis included).*

The court agrees with the government that the application of 31 U.S.C. § 3726 is not limited to carriers that are subject to the ICA. Neither section 3726 ("a carrier or freight forwarder

presenting a bill for transporting an individual or property for the United States shall be paid ...") nor 41 CFR § 101–41.600 ("this subpart sets forth procedures applicable to the presentation, settlement, reconsideration, and review of claims against the United States relating to freight and passenger transportation ...") contains such a limitation. Thus, the court can resolve the preemption issue without regard to whether or not the parties' agreement was based upon the ICA.

9. For instance, disputed claims involving passenger or freight transportation services must first be filed with the General Services Administration (GSA). *41 C.F.R. § 101–41.603–4(a).* Any further dispute must be resolved by requesting reconsideration and, finally, by appealing to the Comptroller General. *41 C.F.R. § 101–41.700, 701.*

"the most appropriate and reasonable rates to use for the storage services provided by NEPSCA," *Plaintiff's Brief in Support of Motion for Partial Summary Judgment (Plaintiff's Brief) at 10,* but that the service plaintiff provided comes within the specific language of Item 41.

The government contends that both the purpose and the language of Item 41 preclude its application in this case. The purpose of Item 41, defendant contends, is to compensate carriers for serious financial loss resulting from the inoperability of their vehicles during the time that they stand idly, loaded with freight, until the consignee takes delivery. In this case, the government points out, plaintiff's storage of the overage did not prevent plaintiff from operating its vehicles, hence no great financial loss was incurred. Additionally, the government asserts, the Item 41 charges apply only where a consignee has arranged a delivery schedule with a carrier and then refuses or is unable to accept delivery at the prearranged time.

The court agrees with the government that the express language of Item 41 precludes its application in this case. When read together with Item 40, it is clear that Item 41 applies only in instances where a consignee refuses or can not accept delivery despite the existence of a prearranged delivery time. Item 41, therefore, could only be used as a basis for recovery in this case if (1) the items stored by NEPSCA constituted "shipments" that (2) were subject to a prearranged delivery schedule, and (3) were held in NEPSCA's possession because of the consignee's refusal or inability to accept them.

GTRP 89–1 defines "shipment" as "a quantity of freight offered to a carrier, on one day, at one place, from one consignor to one consignee on one bill of lading." *GTRP 89–1, Item 28.* In its complaint, however, plaintiff describes the warehoused items at issue as "overage," or "freight not listed on the GBL's which accompanied the trailer." *Complaint at p. 24.* By plaintiff's own ad-

mission, therefore, the items at issue are not "shipments" and are not subject to the storage provisions of Item 41.

Similarly, the items stored by NEPSCA were not subject to a prearranged delivery schedule. NEPSCA was not obliged to deliver the overage to the government at a specific date and time. In fact, the very basis for this suit is NEPSCA's allegation that, because it was unauthorized to deliver the overage without disposition instructions, it was forced to warehouse the items.

Furthermore, the overage was not being held by NEPSCA because of the *consignee's* refusal to accept them. Rather, it was being held because the *consignor* would not provide plaintiff with the GBL's plaintiff believed were necessary for their delivery. Plaintiff does not dispute that the original consignee in this case was the organization intended to receive the goods, while the original consignor was the government.[10] Plaintiff maintains, however, that the government became a consignee when it requested plaintiff to return the overage, at least for the purposes of the new transportation. *Plaintiff's Opp. Brief at 24.*

Plaintiff's argument, although clever, is neither logical nor reasonable. First, a characterization of a single entity as both the consignor and the consignee, where the same exact goods are involved, makes no sense. Furthermore, by the terms of the contract plaintiff's interpretation is unreasonable. In the government's solicitation letter of November 1, 1988, for example, the government made clear that it was seeking transportation of certain goods *from* a governmental entity *to* various destinations. Similarly, in the tender provided by NEPSCA, a government entity is named as the point of origin while the states of New York and New Jersey are named as the destination points. It is clear that the government did not solicit, nor did the parties intend to enter into a contract regarding, the transportation of goods from

---

10. In its Brief in Opposition to Defendant's Alternative Motion to Dismiss, plaintiff states that the overage freight it was storing "could not be delivered by NEPSCA to the consignees which were listed on the Military Shipment Labels affixed to the freight" because NEPSCA was awaiting is-

suance of GBLs by the government. *Plaintiff's Opp. Brief at 23.* A logical inference of this statement is that the government is the consignor of the goods, NEPSCA is the carrier, and the consignee is the intended recipient.

NEPSCA or any other entity back to the government. Because the parties' intended usage of the contract terms is clear, it would be unreasonable to adopt the interpretation urged by plaintiff. *See, e.g., Perry & Wallis, Inc. v. United States,* 192 Ct.Cl. 310, 427 F.2d 722, 725 (1970); *George Hyman Construction Co. v. United States,* 832 F.2d 574, 579 (Fed.Cir.1987).

It is clear that plaintiff can not recover under Item 41 of the GTRP. Plaintiff is not claiming storage charges based upon the failure of a consignee to meet a prearranged delivery schedule. Rather, plaintiff seeks recovery for storing overage freight while awaiting instructions regarding its proper disposition. As a matter of law, Item 41 can not be used as a basis for recovery.

### III. Item 26

▪ Plaintiff contends that, in the event that the court finds that Item 41 is not applicable, Item 26(a) of GTRP 89–1 provides a contractual basis for recovery of the storage charges. Item 26 provides:

Item 26—*Accessorial Service Not Named*

a. Services not named as a requirement in this tender will be negotiated after award. Should additional services be requested and negotiation efforts with primary carrier fail to produce a reasonable charge for such services, the Government retains the right to immediately negotiate with those designated as alternate carriers of this traffic. If such negotiated accessorial service charges, when combined with the alternate base rate produce lower charges, the primary carrier will be routed via the low cost alternate

. . . .

Clearly the services at issue are "services not named" in the contract between the parties. Although it appears that the Item contemplates negotiation of a rate prior to the initiation of services, the fact that plaintiff provided storage services before negotiation was attempted should not prevent the court from applying the policy of Item 26—to provide for a reasonable charge for services requested and provided but not covered by the literal wording of the contract.

Defendant claims that Item 26 is inapplicable to this case because the government never requested plaintiff to store the overage freight. Plaintiff contends that it is irrelevant that the government did not expressly request storage services because the government actions, combined with applicable provisions, precluded plaintiff from doing anything but storing the overage pending disposition instructions.

The court agrees with plaintiff that, regardless of whether the government expressly requested plaintiff to store the overage, the government's actions, combined with the terms of the contract, required that plaintiff store the items. The contract provided that plaintiff was only authorized to transport government property that was accompanied by government bills of lading. *See NEPSCA's Tender at* ¶ 21. The government acknowledges having shipped to plaintiff certain items not accompanied by government bills of lading. *See Defendant's Brief in Support of Motion to Dismiss (Def.'s Brief) at 5.* The government claims, however, that because the contract contemplated only the transport of freight from the government to the consignee, not from the carrier back to the government, GBL's were not required. *See Def.'s Statement of Genuine Issues at 2.* Instead, defendant asserts, plaintiff could have returned the overage "free astray" or on a commercial bill of lading. *Id.*

▪ When a written contract exists and a dispute occurs that falls outside its express language, the court will look for guidance to the purpose and character of the contract. Although the terms of a contract rarely address each and every potential dispute between the parties, they usually have inferences that can assist the court in resolving the dispute. In addition, where one party has had primary responsibility for drafting the terms of the contract, ambiguities regarding how to apply the contract may be resolved against that party. This is the widely accepted doctrine of *contra proferentum. See, e.g., United States v. Turner Construction Co.,* 819 F.2d 283, 286 (Fed.Cir.1987); *Thanet Corp. v. United States,* 219 Ct.Cl. 75, 82, 591 F.2d 629 (1979).

In this case, the contract specifically required that items be shipped on government bills of lading.[11] This provision was a part of a government drafted contract. While the contract addresses only the transport of items from the government to the consignee, it is not unreasonable to conclude, in the absence of an express provision to the contrary, that it is equally applicable to the transportation of the same items to a different destination. Plaintiff's conclusion that the government was required to either issue GBL's, pick up the overage itself, or pay for storage, is both reasonable and fair, particularly in light of the fact that the government was responsible for drafting the contract.

The government contends that, its July 24, 1989 letter requesting plaintiff to return the overage provided plaintiff with the proper authorization to do so. *See Statement of Genuine Issues at 2.* By so doing, however, the government makes an implicit admission that, prior to July 24, 1989, NEPSCA did not have such authorization and therefore had no choice but to store the items. As for the time period between the letter of July 24, 1989 and when the government arranged for pickup on May 1, 1990, the court finds that under the most reasonable and consistent reading of the contract the government should have either provided plaintiff with appropriate GBL's or picked up the overage itself.[12] This the government did not do until over 9 months later. To make the plaintiff responsible for the storage during this period would be to put plaintiff in an untenable position: either apparently violate the contract's provisions on GBL's or risk incurring the possible costs of storing the government's goods. The court can not logically read this into the contract in the absence of specific language to this effect. Further, the doctrine of avoidable consequences strongly argues that the government was in the best position to solve this problem. *See, e.g.,*

*Evra Corp. v. Swiss Bank, Corp,* 673 F.2d 951, 957 (7th Cir.1982); *Midwest Industrial Painting of Florida., Inc. v. United States,* 4 Cl.Ct. 124, 133 (1983). It could have picked up the freight at no risk to its rights. Under the government's asserted interpretation any course of conduct plaintiff chose bore some risk of loss. Under Item 26 of the GTRP, therefore, plaintiff is entitled to the "reasonable rate" for storage of these items for the entire storage period, to and including May 1, 1990.

## IV. Reasonable Rate

The GSA has issued *Certificates of Settlement* for each of the storage claims at issue in this case. *See Appendix to Plaintiff's Brief at 269–435.* In each certificate the GSA found that compensation to NEPSCA should be awarded under a "quantum meruit" theory of recovery. Accordingly, the GSA authorized payment to plaintiff based upon "public warehouse charges as furnished by Mr. John J. Passan, President of Valley Distributing and Storage Co. of Wilkes–Barre." *Id.*

Nowhere in its *Certificates of Settlement* does the GSA mention Item 26 of GTRP 89–1. It is the court's opinion, however, that Item 26 mandates recovery in this case on the basis of a "reasonable rate." Because this court can not determine from the face of the GSA certificates whether the GSA authorized payment on a "reasonable rate" basis, it is the court's opinion that, unless the parties can negotiate a "reasonable rate" without the assistance of the court, a trial will be necessary on this issue.

## CONCLUSION

For the reasons stated above, the court grants plaintiff's Motion for Partial Summary

---

11. The contract also provides for the use of certain specific commercial bills of lading, such as those "showing that the Government is either the consignor or the consignee and endorsed with the following legend...." Neither party, however, makes more than a cursory reference to this provision in their briefs. The court will assume that it is not applicable in this case.

12. It should be noted that, for the entire time period that plaintiff was storing the overage plaintiff informed the government that it could not return the freight without GBL's.

Judgment to the extent that it awards plaintiff recovery based upon a "reasonable rate" for storage charges for the period between February 1989 and May 1990. The court also grants defendant's Motion to Dismiss with respect to those parts of plaintiff's complaint that are based upon the CDA and upon on Item 41 of GTRP No. 89–1.

The parties shall file a Joint Status Report within 60 days setting forth their proposal for further proceedings.

**IT IS SO ORDERED.**