NORTHEASTERN PENNSYLVANIA SHIPPERS COOPERATIVE AS-SOCIATION, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 91–1311C.

United States Court of Federal Claims.

June 10, 1999.

**764**

Joseph M. Roberts, with whom was Ronald N. Cobert, of counsel, Washington, D.C., for plaintiff.

John C. Erickson III, Washington, D.C., with whom were Sharon Y. Eubanks, Deputy Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, and Frank W. Hunger, Assistant Attorney General, United States Department of Justice, for defendant. John D. Fritz, Defense Logistics Agency was of counsel.

## OPINION

SMITH, Chief Judge.

This case is before the court after a trial on damages. In an Opinion dated September 20, 1994, this court held that plaintiff was entitled to "a 'reasonable rate' for storage charges [for overfreight] for the period between February 1989 and May 1990," pursuant to Item 26(a) of the Government Traffic Rules Publication No. 89–1 (GTRP).[1]   32

---

1. The court used the term "reasonable rate" in its earlier opinion to refer to the "reasonable charge" wording of Item 26(a), the court views the phrases as synonymous.

2. The Court's September 20, 1994 opinion also granted in part defendant's Motion to Dismiss with regard to plaintiff's complaint for damages under Item 41 of the GTRP and the Contract Disputes Act.

Fed.Cl. 72, 79 (1994). The court ordered this trial on damages to determine that rate.[2] Plaintiff's summary judgment motion addressed only 98 of the claims listed in plaintiff's complaint. The court shall address the remaining claims below.

After a week of trial and careful review of the post-trial briefs, the court hereby awards plaintiff $55,520.00 as a "reasonable charge" under Item 26(a) for the 98 claims the court awarded summary judgment. In addition, the court awards plaintiff $225.00 in damages for their remaining claims.

## FINDINGS OF FACT

The facts of this case were laid out in detail in the court's earlier opinion. *Id.* at 73–74. Only those findings of facts relevant to determining the "reasonable rate" due plaintiff will be outlined.

Beginning on February 1, 1989, pursuant to a contract between Northeastern Pennsylvania Shippers Cooperative Association, Inc. (NEPSCA) and the United States, plaintiff began transporting freight from the Defense Logistics Agency's (DLA) Mechanicburg Pennsylvania Depot (Depot). The trailers plaintiff received often contained freight not listed on the bills of lading (overfreight[3]), a condition that existed from the inception of the contract through its termination in June 1989.

As the overfreight arrived at its terminal yard, NEPSCA stored it in road-worthy trailers leased thru Advanced Transportation Services, Inc. (ATS) at a base rental rate of $327 per trailer/per month. From February 1, 1989 until June 11, 1989, NEPSCA placed an additional trailer into service, approximately every 14 days, to store the newly arrived overfreight. Uncertain as to what the final disposition of the overfreight would be, NEPSCA was unable to pack the overfreight "high and tight" in order to inspect it.[4]

---

3. The court shall use the terms "overage" and "overfreight" interchangeably to refer to freight in the trailers packed by Depot, but not listed on any bill of lading.

4. At various times throughout the storage period, the government would transmit GBLs to NEPSCA or contact them to check on a Transportation Control Number.

On June 11, 1989, when the government terminated the contract, NEPSCA had leased ten trailers for overfreight storage. The freight was stored in the ten trailers until it was consolidated into other trailers for return to Depot on May 1, 1990.

In total, NEPSCA employed ten trailers for a total of 128 trailer months [5] to store the overfreight it received from Depot without a GBL.

## DISCUSSION

At trial, plaintiff presented two alternative theories for determining what the "reasonable charge" for NEPSCA's storage of the overfreight should be: a per shipment rate based on Item 30—Detention of a Vehicle at Destination, or alternatively, a per trailer rate based on Item 41—Storage [6] plus a detention charge based on Item 30. Defendant responded with two alternatives of its own: industry custom, which was not to charge any fee for overfreight storage, or alternatively, a per trailer rate based upon the reasonable costs incurred by plaintiff.

In addition, both parties raised in their pre- and post-trial briefs objections to the court's September 20, 1994 opinion, asking the court to reconsider its rulings. After careful consideration of the arguments raised by both parties, the court hereby reaffirms its conclusions that: 1) the court's "Contract Disputes Act jurisdiction is preempted in this case;" 2) "the express language of Item 41 precludes its application in this case .... [T]he items at issue are not 'shipments' and are not subject to the storage provisions of Item 41.... As a matter of law, Item 41 can not be used as a basis of recovery;" and finally 3) "Item 26(a) of GTRP 89–1 [Accessorial Service Not Named] provides a contractual basis for recovery of the storage items.... the services at issue are 'services not named' in the contract .... [and] the government's actions, combined with the terms of the contract, required plaintiff to store the items.... therefore, plaintiff is entitled to the 'reasonable rate' for storage of

these items for the entire storage period, to and including May 1, 1990." *Id.* at 75–78.

Thus, the court is left to resolve the original question it posed in its earlier opinion: What is a "reasonable charge" for the accessorial service provided by NEPSCA under Item 26(a)?

### I. Determining a "Reasonable Charge":

#### A. Per Shipment or Per Trailer:

With the court's affirmation of its ruling that the overfreight at issue was not a "shipment," plaintiff's theory of recovery based on an Item 30 per shipment rate is rendered moot and will not be addressed further. Thus the court is left with the alternative theory presented by both parties for determining a "reasonable charge"—a per trailer rate.

#### B. Item 41:

■ At trial plaintiff argued, in the alternative, that if the court chose to a adopt a per trailer analysis, then the court must accept the rates contained in GTRP 89–1 as the only "reasonable" rates in existence because they are the rates the government itself set for storage charges. Specifically, plaintiff urges the court to assess, by analogy, the per shipment storage rates in Item 41 of $40 for the first 24 hours, $55 for the second 24 hours, and $75 for each additional 24 hours. Defendant responded at trial and in its briefs, that the "storage" rates from other inapplicable sections of the contract are irrelevant to determining a reasonable rate for this particular case. The government argued that these rates were: 1) determined distinct from any consideration of the facts of this case and 2) based upon a per shipment basis that this court has already held legally inapplicable.

The court agrees with defendant. As was discussed at length in the court's earlier opinion, any rate for storage contained in NEPSCA's tender offer based on a per shipment basis, as those contained in Item 41

---

5. A "trailer month" is the use of one trailer for one month.

6. "Item 41—Storage (Applicable only to shipments requiring prearranged scheduling of vehicle arrival for unloading as indicated in Item 40)." GTRP 89–1. *See* 32 Fed.Cl. at 75.

are, is inapplicable as a matter of law. *Id.* at 76–77.

### C. Item 30:

■ Plaintiff further contends that any "reasonable charge" under Item 26(a) should include a "detention charge" under Item 30. NEPSCA claims that it is entitled to the $50 per trailer/per day detention rate for the loss of the use of each storage trailer due to Depot's failure to issue a GBL for the overfreight. As with Item 41, plaintiff's expert, Donald Norman, argued that although Item 30 does not apply on its face to the factual situation of this case, the rates contained in Item 30 should nonetheless be adopted by analogy.

Defendant countered during oral argument and in a pre-trial Motion in Limine that Item 30 of GTRP 89–1 is expressly and explicitly inapplicable. Item 30, entitled "Detention of a Vehicle at Destination," provides for a detention charge if a carrier is unable to unload its freight "at the time and place specified by consignee." The clear purpose of Item 30 is to provide compensation, in the form of a detention charge, only when a vehicle staged for delivery is delayed in excess of the free time permitted under Item 30 for unloading at the consignee's destination. The government asserts that Item 30 cannot apply here, as plaintiff rented the additional trailers, and employing the interpretation plaintiff urges on the court would defy the clear language of the Item.

The court again concurs with defendant. The rates in Item 30 were contemplated to deal with a specific factual situation, one that is not present in this case. The overfreight at issue was neither held at the point of destination, nor held because the consignee would not permit unloading. *Id.* at 76. Therefore the provisions and corresponding rates contained in Item 30, are inapplicable both as a matter of law and common sense to the factual situation before the court.

The court thought it had made clear in its previous ruling, that because no provision in GTRP 89–1 explicitly addressed the unusual facts of this case, the court would need to hear evidence to determine a "reasonable rate" as *none* of the rates contained in GTRP 89–1 were applicable.

Throughout the trial on damages, plaintiff spent virtually its entire case attempting to convince the court that the rates contained in various provisions of GTRP 89–1 were the only "reasonable rates" the court could adopt simply because they were drafted by defendant. While the court stated that, when "a dispute occurs that falls outside [of the contract's] express language, the court will look for guidance to the purpose and character of the contract, [and] ... the terms of a contract ... usually have inferences that can assist the court in resolving the dispute," this was not meant to imply that the court could look only to other terms or rates in the contract to resolve unexpected disputes. *Id.* at 77.

### D. "A Reasonable Charge":

#### i. Industry Custom

■ The court is thus left with the task of attempting to recreate an arms-length bargaining situation to determine what "reasonable charge" the parties would have agreed to had they negotiated a price prior to the service being commenced. Defendant argued that the transportation industry custom is not to charge for storing overfreight at a carrier's terminal facility. Defendant's witnesses testified that the handling and storing of overfreight is an assumed, expected, and accepted cost of doing business in the Less Than Truckload (LTL) carrier industry, and therefore a carrier and a shipper would negotiate a rate of zero dollars for the storage of the overfreight at issue. Thus, defendant asserts that the court should find that the "reasonable charge" the parties would have negotiated was zero dollars. Further, defendant argues that for the court to award any amount, the court must find that the particular service provided by NEPSCA in storing the overfreight was sufficiently distinct from the standard industry practice.

As the court noted in its earlier opinion, and as was reaffirmed at trial by the testimony of defendant's own expert, Mr. Nicholas Wingerter, "this is a very unique case ... this is the first case that I have ever been

involved with to have had this unique matter of long term storage. This is a weird duck, so to speak." Tr. at 827. The testimony at trial served to buttress the court's previous conclusion that NEPSCA provided a distinct, compensable, accessorial service under Item 26(a).

The storage provided by plaintiff differed substantially from the industry standard for numerous reasons, the three primary ones being: 1) the length of storage; 2) the amount of overfreight; and most importantly 3) the court's findings that "the contract specifically required that items be shipped on government bills of lading.... the government should have either provided plaintiff with appropriate GBL's or picked up the overage itself.[7] ... To make the plaintiff responsible for the storage during this period would be to put plaintiff in an untenable position: either apparently violate the contract's provisions on GBL's or risk incurring the possible costs of storing the government's goods." 32 Fed.Cl. at 78. "[T]he government's actions, combined with the terms of the contract, required plaintiff to store the items." *Id.* at 77.

This combination of unique factual circumstances and the legal liability facing plaintiffs if they were to ship the overfreight back to Depot without a GBL (and the possible violation of other federal regulations for handling hazardous materials in some cases) factually distinguishes the storage service provided by NEPSCA from that provided by other LTL carriers.

ii. Reasonable Costs Incurred

As an alternative, defendant presented a credible per-trailer based "reasonable rate" theory, through the testimony of Mr.

Wingerter, based on the reasonable costs incurred by NEPSCA in storing the overfreight. Plaintiff did not present an actual expense model to the court, but these costs were brought out on direct and cross-examination at trial.

After a thorough examination of the record, the court holds that the appropriate model for assessing damages is the reasonable and rationally related costs NEPSCA incurred in storing the government overfreight from February 1, 1989 to May 1, 1990. The provisions of Item 26(a) foresee the parties negotiating a "reasonable charge" prior to the commencement of the "accessorial service." In this situation, the court is forced to determine what an arms-length negotiation between the parties would have produced for the long-term storage of this miscellaneous freight. The court acknowledges that such an analysis by definition will be somewhat imprecise. Thus the court's conclusion of a what a "reasonable charge" due under Item 26(a) must necessarily be based on the most concrete evidence available.

The court reviewed the testimony of both Mr. Michael Dantone, General Manager of NEPSCA, and Mr. Wingerter[8] to determine what additional costs were incurred by plaintiff. Mr. Dantone testified that NEPSCA leased road-worthy trailers for the overfreight storage through ATS at a base rate of $327.00 per trailer/per month. In addition to this base rate, the court awards plaintiff $63.00 per trailer/per month in insurance and damage waiver charges NEPSCA paid to ATS for the leased trailers.[9] These two costs ($327 + $63 = $390.00 per trailer/per month) represent the total expenses reasonably and rationally related to the storage of the overfreight.[10] Therefore, the court finds

---

7. "It should be noted that, for the entire time period that plaintiff was storing the overfreight plaintiff informed the government that it could not return the freight without the GBLs." *Id.* at fn. 12.

8. The court found the testimony of Mr. Wingerter, a 25-year veteran of the shipping industry, highly credible in ascertaining what the reasonable and rationally related costs incurred by plaintiff were.

9. Mr. Dantone did not testify as to an exact amount NEPSCA paid for the insurance waiver,

stating on cross-examination only that "The trailer rental charge was probably closer to $400 when you add the physical damage waiver in there." Mr. Wingerter assessed the waiver charge at $63.00 per trailer/per month.

10. Plaintiffs asserted at trial that they incurred other expenses in dealing with the overfreight including labor and handling expenses. Defendant countered that any such claims for additional compensation should be denied. The sorting and handling of overfreight is a necessary and incidental component of the shipping business.

that NEPSCA incurred $49,920.00 in reasonable expenses for storing the overfreight.

Finally, the court must determine what additional compensation is due plaintiff, in addition to the actual costs, to reach a "reasonable charge" for the accessorial service provided. As noted, the court's task is not simply to ascertain the cost to NEPSCA, but also to resolve what two reasonable parties would have negotiated as a profitable operating ratio for providing storage service. On this point, the court also found Mr. Wingerter's experience and testimony highly credible.

The operating ratio for the freight industry has historically been calculated by taking one's operating expenses before taxes and dividing them by revenue. Mr. Wingerter, using the $390 per trailer/per month expense rate, added a reasonable transportation shipping industry profit of approximately 11% [11] to obtain about an 89% operating ratio and a $434.00 per trailer/per month rate. TR at 794–6. As noted, plaintiff did not directly address defendant's "per trailer" model, preferring instead to spend their cross-examination of Mr. Wingerter in pursuit of their own theories.

Based on Mr. Wingerter's expert opinion, the court finds that the "reasonable charge" due plaintiffs includes a reasonable profit of 11%; bringing the total "reasonable charge" due plaintiff to $434 per trailer/per month. Thus, the court awards plaintiff $55,552.00 as the "reasonable charge" owed for the 128 trailer months of overfreight storage provided.

The court concurs with defendant, that any costs involved in handling overfreight are subsumed in the line haul rates negotiated with carriers and are not separately assessable under Item 26(a) as an "accessorial service."

11. The operating rate offered by defendant's expert, and adopted by the court is 11.282%.

12. Throughout this litigation, plaintiff has alternatively referred to "22" or "23" as the number of remaining claims. At trial the court allowed the admission of 23 additional GSA Certificates comprising Plaintiff's Exhibits 38A-38W.

## II. Plaintiff's Remaining Claims

Plaintiff excluded from their Motion for Partial Summary Judgment approximately 23 additional claims.[12] Unlike the 98 claims which the court awarded summary judgment, these remaining claims were disputed by the General Services Administration (GSA) auditor for a reason other than merely the storage rate assessed by NEPSCA. At trial plaintiff entered into evidence the GSA Certificates of Settlement (Certificates) for their 23 additional claims (PX38A–38W). Plaintiff's remaining claims seek an additional $561,587.00 in storage charges. The Certificates proposed to pay plaintiff $839.44.[13]

While the central focus of this trial was to establish the "reasonable rate" for the 98 claims where liability was established, plaintiff continued to bear the traditional burden of proof for establishing liability and damage for the remaining claims. On this front, the record is remarkably thin. Testimony at trial on the remaining claims was quite brief, with plaintiff relying on the assertions of Mr. Dantone as to the validity of their original GSA submissions and the admission of PX38A–W into evidence. As with the 98 claims discussed above, plaintiff's sought the maximum storage charge allowed under Item 41, in addition to freight charges for each of the remaining claims.

The government did not respond directly, but an examination of the Certificates provides the court with a sufficient explanation of GSA's decision on each of plaintiff's claims. In summary, GSA denied 13 of the claims entirely [14] and awarded plaintiff storage charges on the remaining 10 [15] based on quantum meruit, using public warehouse charges.[16]

13. The GSA Certificate attached to claim 33-3059219(PX 380), indicates that a Treasury check was included "in settlement of said claim."

14. PX38F, I, K-N, P, R-W.

15. PX38A-E, G-H, J, O, Q.

16. The court shall not reiterate herein the specific reasons cited by GSA for the denial of the thirteen claims, as they are stated on the individual Certificates.

For the ten which GSA determined some settlement was appropriate, GSA uniformly held

Neither plaintiff nor defendant addressed the remaining claims any further in their post-trial briefs or specifically at closing argument.

The court's examination of the 23 Certificates and the testimony surrounding them at trial, convinces us that none of the claims qualify as a "shipment" under Item 28 of GTRP 89–1. Thus, even assuming liability, any possible recovery for overfreight storage as an "accessorial service not named" would have to be based on the court's finding that the "reasonable charge" for this service is $434.00 per trailer/per month.

As noted in the court's Findings of Fact and testified to by plaintiff at trial, all of the overfreight and any incomplete shipments of freight were stored in the ten storage trailers at NEPSCA's terminal yard to await either a GBL or the remaining freight. There was no testimony from any of plaintiff's witnesses that the freight identified in PX38A–W was stored separately or distinctly from the freight involved in the 98 claims already awarded summary judgment. In fact, all but two (PX38A and PX38I) of the claim forms submitted to GSA for plaintiff's remaining claims state that the freight was returned to Depot on May 1, 1990 by Central Storage & Transfer with the other overfreight.

Thus, even if the court were to find that plaintiff's had met their burden of proving liability for the 21 remaining claims, their claim for damages would be redundant. The consistent testimony from plaintiff's witnesses was that all of the overfreight involved in their 120 claims was stored in the ten trailers. Further, plaintiff's claims admit that these 21 items were returned on May 1, 1990 with the other 98 items. Therefore, based on the court's adoption of a per trailer rate, plaintiff's remaining 21 claims for storage costs are subsumed within their other claims and the court's $55,520.00 "reasonable charge" award. As plaintiff has already been

awarded the reasonable charge for storing ten trailers of overfreight, the court cannot now grant additional compensation for the storage of certain individual items contained inside those trailers. To award plaintiff any additional amount for these items would impermissibly award the plaintiff twice for the same service.

Finally, the court will address the two remaining claims not returned on May 1, 1990. As noted in footnote 15 above, a GBL was issued to NEPSCA for PX38A on May 19, 1989 and the freight was moved on, with NEPSCA billing and receiving $397.59 for transportation charges but nothing for storage. GSA determined that plaintiff was due an additional $74.14 for storage and handling. However, based on the court's holdings in Section I regarding storage, the court finds that plaintiff has been fully compensated for the storage and handling of claim PX38A. As explained above, handling of overfreight is a necessary and incidental component of the shipping business. The court's award of an 11% profit is intended to encompass any minor handling charges plaintiff may have incurred in moving the overfreight. As for PX38I, GSA denied any award to plaintiff stating, "[Depot's] records indicate that the material for which you are claiming storage charges has never been returned to [Depot] and that you have furnished nothing to support your contention that this material was ever stored at your facility." Plaintiff presented no evidence to contradict this finding at trial. Thus the court holds that with regard to the claim represented by PX38I, plaintiff has failed to meet its burden and the claim is denied.

The court holds that plaintiff did not meet its burden of proving the right to any additional compensation for the storage for their 23 remaining claims beyond what the court has already awarded. Plaintiff, however, is entitled to the transportation costs incurred for claims PX38B–E, G, and H as found by GSA of $225.00.[17]

that: the items did not constitute a shipment under Item 28 of GTRP 89-1; that therefore the maximum charge in Item 41 of GTRP 89-1 did not apply; and that they were basing the allowable storage charges on quantum meruit using public warehouse charges. The GSA auditor

awarded plaintiff the "transportation as billed" for PX38B-E, G, H, J, O, and Q.

17. GSA awarded $42.60 in transportation costs for claim PX38O, however, as noted in above footnote 12, the Certificate indicates that a Trea-

## CONCLUSION

This has been one of the more factually unique cases the court has dealt with, a fact noted both by the parties' experts and diametrically opposed damage models. The court struggled to reconcile the two points of view, but in this case that was impossible. It is never easy to determine post-hoc what rate two parties would have negotiated for a service that neither party seemed anxious to enter into. In this case the contract specifically foresaw that "accessorial services not named" might arise and provided that the parties should establish a "reasonable charge" for these services.

In this case, the "reasonable charge" is $55,745.00.

IT IS SO ORDERED.