**Donald ELDEN and Lois Elden**

v.

**The UNITED STATES.**

No. 411–77.

United States Court of Claims.

March 19, 1980.

William J. Dale, Bartlesville, Okl., attorney of record, for plaintiffs.

Ronald G. Gluck, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant.

Before COWEN, Senior Judge, and NICHOLS and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case comes before the court on exceptions by the parties to the recommended decision of Senior Trial Judge Mastin G. White, filed May 21, 1979, pursuant to Rule 134(h), having been submitted and considered on the briefs and oral argument of counsel.

Defendant's sole exception to the trial judge's report is denied. As explained in defendant's brief, it is concerned that the court at trial refused a "directed verdict" and insisted on receiving evidence that the flooding of plaintiff's leasehold was "necessary." Evidence was readily provided and the ultimate decision was in defendant's favor. We think the trial judge's concern with the issue of necessity is unsurprising in view of the lease provision that the right was reserved "to flood the leased premises whenever necessary, to manipulate the level of the reservoir or pool in any manner whatsoever * * *." The existence of a comma following the word "necessary" would seem to have an impact on its meaning. It did not define the necessity nor state who was to determine it. We think the trial judge was justified in wanting to be shown that there were reasons of weight connected with the operation of the system, that led defendant's officers to cause the water in the Fort Gibson Reservoir to rise above its normal level in preference to delivering the flood waters somewhere else. Under the clause used in the lease, the standard of proof of necessity and the weight to be given to the Engineer's determination remain unstated. They were not determined by the trial judge and will not be by us, since the proof of necessity was adequate to meet any standard. No doubt defendant has in mind the doctrine of the law of eminent domain that "necessity" for a taking is not a judicial question, *e. g., Joslin Co. v. Providence*, 262 U.S. 668, 678, 43 S.Ct. 684, 689, 67 L.Ed. 1167 (1923); *Bragg v. Weaver*, 251 U.S. 57, 58, 40 S.Ct. 62, 63, 64 L.Ed. 135 (1919). This does not of its own force apply to construction of a contract, which a lease is, where *contra proferentem* might have weight. The issue that concerns defendant can be left to a case where it has to be decided. If defendant were right to be concerned, we do not think the inserted language it proposes would deal with the problem adequately.

The alleged effect of 33 U.S.C. § 702c in immunizing defendant from liability to plaintiffs also can be left to future cases.

In open court defendant, through counsel, stated that should defendant prevail as to plaintiffs' petition and claim, as it has done, defendant would waive recovery on its counterclaim.

Since the court agrees with the trial judge's recommended decision, as hereinafter set forth *, it hereby affirms and adopts the decision as the basis for its judgment in this case. It is, therefore, concluded that plaintiffs are not entitled to recover, and the petition and counterclaim are dismissed.

## OPINION OF TRIAL JUDGE

WHITE, Senior Trial Judge:

In this case, which was originally filed in the United States District Court for the Northern District of Oklahoma and thereafter transferred to the Court of Claims, the plaintiffs filed a petition seeking to recover $100,000, plus reimbursement for litigation expenses, because of the alleged taking by the defendant's Corps of Engineers, Department of the Army, of premises which the plaintiffs held under a lease from the Corps of Engineers and used in conducting a commercial recreation business on the shore of a body of water known as Fort Gibson Reservoir or Fort Gibson Lake, situated in the State of Oklahoma.

In support of the plaintiffs' claim, the petition alleged that during the greater part of 1972, 1973, and 1974, the water surface level in the Fort Gibson Reservoir remained from 15 to 30 feet above the normal water level; that the high water level was intentionally maintained by the Corps of Engineers; that this prevented the plaintiffs from conducting their commercial recreation business on the leased premises; and that such action by the Corps of Engineers amounted to a cancellation of the lease and an eviction of the plaintiffs.

---

* Although the court adopted the trial judge's separate findings of fact, which are set forth in his opinion, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

In connection with its answer, the defendant asserted a counterclaim in the total amount of $2,159.86, of which the sum of $741 allegedly represented rent due from the plaintiffs on the leased premises and the sum of $1,418.86 allegedly represented expense incurred by the Government in restoring the premises after the termination of the plaintiffs' lease.

On motion of the defendant, and without objection by the plaintiffs, the trial was held on the sole issue of the defendant's liability to the plaintiffs, with the amount of the plaintiffs' recovery (if any) and all issues pertaining to the defendant's counterclaim being reserved for further proceedings (if necessary).

The lease that is involved in the present case was numbered DA–34–066–CIVENG–63–392 and was issued on October 15, 1962, by the Secretary of the Army (acting through the Chief of the Real Estate Division, Corps of Engineers). It leased to Delmar F. Shutler and Edythe M. Shutler, for commercial concession purposes, a parcel of government-owned land containing 13.8 acres, more or less, known as the Three Finger Bay concession site and located on the right (or west) bank of the Fort Gibson Reservoir. The lease was for a term of 20 years, beginning on January 1, 1963, and ending on December 31, 1982. The plaintiffs first acquired interests in the lease pursuant to an assignment dated February 8, 1971; and they became the sole lessees of the Three Finger Bay concession site pursuant to a document dated March 27, 1971.

Ordinarily, there is overland access to the Three Finger Bay concession site by means of a black-top entrance road that is maintained by the Corps of Engineers. This road connects with a public highway at a point westward of the concession site, and then runs across government-owned land in an easterly and northeasterly direction to the concession site. The elevation of the entrance road varies from place to place, the lowest point being 570 feet, mean sea level ("m.s.l."), at a place where the road crosses a creek, and the highest point being in excess of 582 feet m.s.l.

The Fort Gibson Reservoir is operated by the Corps of Engineers and is located on the Grand River in Oklahoma,[1] north of the point where the Grand River empties into the Arkansas River. It is part of a system of reservoirs which the Corps of Engineers operates in the Arkansas River Basin, a large area extending from about Great Bend, Kansas, to the point near Fort Smith, Arkansas, where the Arkansas River leaves the State of Oklahoma and flows into the State of Arkansas. The system, in addition to the Fort Gibson Reservoir, includes the following major dam-and-reservoir projects on the Arkansas River or its tributaries within the Arkansas River Basin: Keystone on the Arkansas River; Oologah on the Verdigris River; Hulah on the Caney River; Eufaula on the Canadian River; Wister on the Poteau River; and Tenkiller Ferry on the Illinois River. All of these dam-and-reservoir projects, including the Fort Gibson project, are multi-purpose projects, and are operated by the Corps of Engineers for the purposes of flood control, hydroelectric power generation, and navigation.[2]

The top of the power pool in the Fort Gibson Reservoir is at the elevation of 554 feet m.s.l. This is the normal elevation at which the Corps of Engineers customarily maintains the water level in the reservoir, except when drought or flood conditions prevail in the area. The Fort Gibson Reservoir provides flood control storage capacity from the top of the power pool at 554 feet m.s.l. up to a maximum elevation of 582 feet m.s.l., and thus permits the storage in the reservoir of a maximum of 919,200 acre-feet of flood waters, above the power pool.

On the Grand River upstream from the Fort Gibson Reservoir, there are two dam-and-reservoir projects that are operated by the State of Oklahoma for purposes other than flood control. The reservoir immedi-

1. This stream runs from the State of Kansas into the State of Oklahoma. In Kansas, it is commonly known as the Neosho River.

2. In some instances, projects also provide for water supply, fish and wildlife, and recreation.

ately upstream from Fort Gibson is known as Lake Hudson, and the reservoir upstream from Lake Hudson is known as Grand Lake. Although Lake Hudson and Grand Lake are operated by the State of Oklahoma for purposes other than flood control, each of these reservoirs has flood control storage capacity. In flood situations, the flood control storage capacity in each reservoir is controlled, and the reservoir is operated, by the Corps of Engineers for flood control purposes as part of the Arkansas River Basin system and in conjunction with the flood control projects previously mentioned in this opinion.

The Three Finger Bay concession site and related facilities were in good physical condition in the early part of 1973. At that time, the site included the following improvements owned by the plaintiffs for the conduct of business: a floating dock on which the plaintiffs operated a restaurant and facilities for the sale of gasoline, oil, bait and other fishing supplies, beverages, and ice; floating docks providing three kinds of boat storage for rental purposes (i. e., enclosed storage where boats could be completely enclosed in stalls and locked up, covered storage where the stalls were covered with a roof that protected the boats from rain, and open storage where the stalls did not have any sort of cover); restrooms; a parking lot; a place for seven trailers; and a boat ramp where boats could be launched into or retrieved from the reservoir. The plaintiffs were planning to construct new restrooms, a new restaurant, and a new gasoline sales facility.

The floating docks mentioned in the preceding paragraph were made of wood and corrugated metal, with some angleiron construction. Flotation was provided by metal drums affixed to the docks. The docks were anchored to the bank of the reservoir, but with sufficient flexibility that they could, within limits, move up or down with the fluctuation of the water level in the reservoir. All the docks could rise with the water level at least 28 feet above the normal power pool elevation of 554 feet m.s.l. without sustaining damage from the mere raising of the water level. However, a rise in the water level of the reservoir above 557 feet m.s.l. made the boat storage stalls inaccessible from the reservoir bank. Also, whenever the water level in the reservoir rose above the elevation of 560 feet m.s.l., there was no access to the floating restaurant and sales dock, and it was necessary to disconnect the electricity serving that dock. It has previously been indicated that access to the concession site by means of the entrance road became impossible whenever the water level in the reservoir rose above 570 feet m.s.l.

In addition to the business facilities previously mentioned, there was a house on the concession site. It was situated on high ground, above the elevation of 582 feet m.s.l. The house was occupied by the plaintiffs and their children.

In flood conditions, it is the customary practice and procedure of the Corps of Engineers to operate the Arkansas River Basin system, and to manage the flood control storage capacity in the various reservoirs, in such a way: (1) that approximately the same percentage of the flood control storage capacity in the various reservoirs will be utilized at all times, both during the progress of the flood and as it recedes; and (2) that flood damage to persons and property in the Arkansas River valley downstream from the system will be avoided, or at least minimized as much as possible. Accordingly, in flood situations, the Corps of Engineers customarily endeavors to hold the flow of waters in the Arkansas River immediately downstream from the system to not more than 105,000 cubic feet per second, and to store the surplus flood waters temporarily in the various reservoirs of the system, utilizing for this purpose approximately the same percentage of the flood control storage capacity in the various reservoirs. The Corps of Engineers deems it advisable, however, not to utilize more than 50 percent of the flood control storage capacity in the various reservoirs at any one time; and in order to adhere to this guideline, the Corps of Engineers, when necessary, customarily increases the rate of release of flood waters from the various res-

ervoirs, on a balanced basis, so that the flow of waters in the Arkansas River immediately downstream from the system exceeds the preferred rate of 105,000 cubic feet per second, up to a maximum (if necessary) of 150,000 cubic feet per second. The latter is regarded as the maximum amount of flow that the Arkansas River at the point mentioned can handle without doing substantial flood damage to persons and property downstream; and the Corps of Engineers in situations of necessity customarily utilizes, on a balanced basis, whatever flood control storage capacity is available in the reservoirs of the system, up to the maximum provided for, in order to avoid increasing the flow of waters in the Arkansas River immediately downstream from the system beyond the volume of 150,000 cubic feet per second.

As flood conditions abate, it is the customary practice and procedure of the Corps of Engineers to reduce the stored flood waters in the various reservoirs, on a balanced basis, until all the flood waters have been released and the various reservoirs have reached the normal operating levels of their respective power pools.

In the absence of any evidence to the contrary, it is reasonable to infer from the evidence in the record, and to find, that the Corps of Engineers, in managing the reservoirs of the Arkansas River Basin system during the times pertinent to this case, followed the customary practice and procedure previously outlined in this opinion. (Rule 406, Federal Rules of Evidence.)

The evidence in the record indicates that, because of above-average rainfall in the Arkansas River Basin, and the action of the Corps of Engineers in temporarily storing flood waters in the reservoirs of the basin pursuant to the customary practice and procedure previously described, there was high water in the Fort Gibson Reservoir during part of November 1972, during the period which began in March and ended in June of 1973, during the September-December period of 1973, in March 1974, and in June 1974. Because of the high water, the plaintiffs could not operate their concession business for approximately half of November 1972, for approximately 3 months during the March-June period of 1973, for approximately 2 months during the last quarter of 1973, for the greater part of March 1974, and for approximately half of June 1974. When the business was shut down because of the high water, the plaintiffs did not receive any income from the concession, other than storage fees on the boats that were already stored in the rental stalls.

The surface level of the water in the Fort Gibson Reservoir was so high for a 60-day period in the spring of 1973, for 18 days in the fall of 1973, for 6 days in March 1974, and for 9 days in June 1974, that a substantial part of the entrance road was covered with water and the plaintiffs' customers and would-be customers did not have access to the concession site. However, the surface level of the water in the reservoir did not, during any of the floods previously mentioned, ever reach the elevation of 582 feet m.s.l., which represented the top of the maximum flood control pool provided for in the Fort Gibson Reservoir. Thus, the Corps of Engineers did not, at any time, utilize the flood control storage capacity of the Fort Gibson Reservoir to the maximum extent.

The flood waters previously mentioned not only prevented the plaintiffs from operating the concession for various periods, and deprived them of needed income, but the flood waters brought logs, downed trees, and other floating objects to the vicinity of the concession site. Some of these floating objects struck and did a great deal of damage to the plaintiffs' floating docks. In some instances, docks were so badly damaged that they could not be repaired and salvaged.

As flood waters receded, they left the concession site littered with debris, including downed trees, empty bottles, empty cans, and mud. Following each flood, the plaintiffs and their children were faced with the task of clearing the concession site of debris and repairing the damage that had been done to the physical facilities. Materials necessary for the making of re-

pairs were purchased by the plaintiffs on credit or with borrowed funds, as the loss of all income from the concession (other than boat storage fees) during the periods of flooding left the plaintiffs in financial straits.

The concession lease provided, in what was referred to as condition 2, that "the lessee shall pay to the United States rental in the amount of One Hundred and 00/100 Dollars ($100.00) per annum, payable annually, in advance, and shall also pay to the United States on or before the tenth (10th) day of each calendar month Four and 41/100 (4.41) per cent of the gross income of the lessee from the business operations conducted on the leased premises during the preceding calendar month."

Although there was some gross income from the operation of the Three Finger Bay concession in each month during the period which began on October 1, 1973, and extended through October 31, 1974, the gross income during such period was not sufficient to defray the business expenses involved in the operation of the concession, purchase the materials needed for making repairs to the physical facilities that were damaged by the floods, and cover the necessary living expenses of the plaintiffs and their children. In order to make up the deficit, both plaintiffs worked at outside jobs from time to time when their concession business was closed down because of flood conditions.

Because of their financial plight, the plaintiffs failed to pay the annual fixed rental for the calendar year 1974, and also failed to pay the monthly percentage rentals for the months during the period which began with October 1973 and extended through October 1974, as called for by the provisions of the lease.

Payment of the rentals then due was requested by the Corps of Engineers in a letter dated January 21, 1974, and addressed to the plaintiff Donald Elden. The plaintiffs having failed to respond to that letter, and additional monthly rentals having become due and unpaid in the meantime, the Corps of Engineers wrote to the

plaintiff Donald Elden again on September 5, 1974, concerning the nonpayment of rentals and asking that payment be remitted without further delay. The plaintiffs did not respond to the letter of September 5, 1974, or take any action with respect to the payment of the annual fixed rental for the calendar year 1974 or the monthly percentage rentals for the months beginning with October 1973.

On November 1, 1974, the District Engineer in charge of the Tulsa District, Corps of Engineers, wrote a letter to the plaintiff Donald Elden, which stated in part as follows:

Since your rental payment has been in arrears for a period considerably longer than 10 days, lease DA–34–066–CI-VENG–63–392 is hereby terminated as specified by the inclosed Notice of Revocation. You are required to vacate the premises, remove your property, and restore the area by 29 January 1975.

Accompanying the letter mentioned in the preceding paragraph was a formal "Notice of Revocation" dated November 1, 1974, and addressed to the plaintiff Donald Elden by the District Engineer. This notice stated in part that the lease was "hereby revoked, effective 1 November 1974"; and that "you are hereby notified to remove your property from said premises within Ninety (90) days after the date of receipt of this notice."

As indicated in the District Engineer's letter, the specific reason for the termination of the lease was the nonpayment of rentals due the Government.

The plaintiff Donald Elden responded to the District Engineer's communication of November 1, 1974, and to the formal notice of revocation, by writing a letter to the District Engineer under the date of January 15, 1975. Mr. Elden did not raise any question concerning the propriety of the District Engineer's action in terminating the lease. Mr. Elden did request, however, that the termination date be deferred until July 29, 1975, and outlined the reasons why, in his opinion, it would be unfair to him and

to his customers if the lease were terminated at an earlier date.

The Deputy District Engineer of the Tulsa District responded to Mr. Elden's letter of January 15, 1975, by means of a communication which stated in part that inasmuch as the lease had been terminated and was no longer in existence, an extension of the lease was not possible, but that the time for the removal of the plaintiffs' improvements from the concession site was extended for an additional 30 days to February 28, 1975.

The plaintiffs' improvements had been removed from the concession site or destroyed by March 1975.

The plaintiff's case is based on the theory that the flooding of the concession site on the occasions previously mentioned was caused "by the intentional design and action" of the defendant and, therefore, amounted to improper interference with the plaintiffs' use and enjoyment of the leased premises.

That the defendant intentionally caused the flooding of the concession site is true in the sense that the Corps of Engineers, as the responsible agent of the defendant, intentionally stored flood waters temporarily in the reservoirs of the Arkansas River Basin system, including the Fort Gibson Reservoir, in order to avoid or minimize flood damage to persons or property in the Arkansas River valley downstream from the system; and the quantity of flood waters thus stored in the Fort Gibson Reservoir was sufficient to flood the concession site on the occasions previously mentioned in the opinion.

The concession lease, however, expressly provided for such contingencies. Condition 20 of the lease stated in pertinent part, and in unambiguous language, as follows:

20. That the right is hereby reserved to the United States, its officers, agents, and employees, * * * to flood the leased premises whenever necessary, to manipulate the level of the reservoir or pool in any manner whatsoever, * * * and the lessee shall have no claim for damages of any character on account thereof against the United States or any officer, agent, or employee thereof.

Furthermore, condition 23 of the lease provided in part, and with equal clarity, as follows:

23. That the United States shall not be responsible * * * for damages to the property of the lessee * * * arising from or incident to the flooding of the leased premises by the Government * * *.

Thus, the Government did not exceed the right which it expressly reserved to itself in the unambiguous language of conditions 20 and 23 of the lease just quoted.

Furthermore, it should be mentioned in this connection that the plaintiffs, when they were negotiating for the acquisition of interests in the lease, were aware of the fact that the Fort Gibson Reservoir was operated for the purpose of flood control (among other purposes) and the water surface level in the reservoir rose during flood conditions; that both of the plaintiffs read, and were familiar with, all of the provisions of the lease, including conditions 20 and 23; and that both of the plaintiffs knew that they were agreeing to become bound by all of the lease conditions, as though they were the original lessee.

It is true that, when the plaintiffs were conducting the negotiations for the acquisition of interests in the lease, the plaintiff Donald Elden was unaware that the water surface level in the Fort Gibson Reservoir had ever risen so high during flood conditions that the Three Finger Bay concession site became inaccessible by land, and that the plaintiff Lois Elden was familiar with only one such occasion, which occurred in the year 1957. However, the plaintiffs did not inquire as to how high the water surface level in the reservoir could rise when the flood control storage capacity was being utilized to the maximum extent.

■ As the portions of conditions 20 and 23 of the lease previously quoted were phrased in unambiguous language, the words of those provisions must be given their plain and ordinary meaning by the court in defining the rights and obligations

# 261

of the parties with respect to the flooding of the Three Finger Bay concession site. *Timber Access Industries Co. v. United States*, 213 Ct.Cl. 648, 658, 553 F.2d 1250, 1256 (1977); *Thanet Corp. v. United States*, 219 Ct.Cl. ——, ——, 591 F.2d 629, 633 (1979). Under the plain language of those provisions, it was the right of the Government to flood the leased premises—and it was the obligation of the plaintiffs to accept such flooding—whenever it was necessary for the Corps of Engineers, in properly carrying out its flood control responsibilities in the Arkansas River Basin, temporarily to store in the Fort Gibson Reservoir flood waters in such volume as to flood the Three Finger Bay concession site. There is no evidence in the record tending to prove that the Corps of Engineers stored more flood waters in the Fort Gibson Reservoir—or retained them in the reservoir for a longer period—than was reasonably necessary to protect persons and property downstream from flood damage.

The plain language of the portions of conditions 20 and 23 of the lease previously quoted cannot be ignored or set aside because the plaintiffs, on the basis of their knowledge of past floods as of the time when they acquired interests in the concession lease, did not anticipate the frequency and extent of the floods that actually developed during the 1972–74 period.

It necessarily follows from the previous discussion that the Corps of Engineers did not violate any legal rights of the plaintiffs when the Three Finger Bay concession site was flooded in 1972, 1973, and 1974 during the course of the agency's flood control operations, and, accordingly, that there was no taking of any property interest of the plaintiffs.

Moreover, the unfortunate financial consequences of the floods to the plaintiffs in connection with the operation of their concession business did not provide any legal justification for the plaintiffs' failure to pay the fixed annual rental for 1974 and 13 monthly percentage rentals, as called for by the plain language of the concession lease. Accordingly, it was within the discretion of the Corps of Engineers to terminate the lease for nonpayment of rentals, inasmuch as the lease stated in plain language that "if the rent * * * or any part thereof shall be in arrears and unpaid for ten (10) days after the same should have been paid, then and in such case the United States may, through said District Engineer, elect to terminate this lease by notification in writing to the lessee * * *."

For the reasons previously stated in the opinion, the plaintiffs are not entitled to recover, and the petition should be dismissed upon the conclusion of proceedings relative to the defendant's counterclaim.

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court, the court concludes as a matter of law that the plaintiffs are not entitled to recover. The petition and counterclaim are dismissed.