Rob ROY, pro se, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 95–319C.

United States Court of Federal Claims.

June 9, 1997.

genuine issue of material fact exists that would establish that certain Federal Bureau of Investigation (the "FBI") agents possessed the requisite authority to bind the Government to an oral contract to pay an FBI informant for his services. Argument is deemed unnecessary.

## FACTS

The facts in this contract action are undisputed, unless otherwise noted. In August 1987 the FBI arrested Rob Roy ("plaintiff") for illegally aiding and abetting the distribution of cocaine within 1,000 yards of a school. Plaintiff faced up to 80 years imprisonment and a $2 million fine if convicted of this crime.[3] The FBI, however, offered plaintiff a deal. If plaintiff pled guilty, agreed to become an FBI informant, and substantially assisted the FBI in targeting and prosecuting drug traffickers in the Philadelphia area, the FBI would file a memorandum with plaintiff's sentencing judge detailing plaintiff's cooperation.[4] Plaintiff accepted this deal and began operating a bookmaking/money laundering "sting operation" in a store containing FBI surveillance equipment. During the four years in which he ran this operation, plaintiff accumulated substantial audio and video evidence that enabled the FBI to identify, infiltrate, and destroy some of the largest drug rings in Philadelphia. According to the Government Sentencing Memorandum, *United States v.[Roy]*, Crim. No. 91–539 (E.D.Pa. Dec. 16, 1993), which summarized the extent of plaintiff's cooperation and the positive results that plaintiff helped the FBI achieve, "the impact of [plaintiff's] cooperation on the North Philadelphia drug trafficking community was tremendous." After considering this memorandum, plaintiff's sentencing judge waived

Rob Roy, plaintiff pro se.

Armando O. Bonilla, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant.

### *OPINION*[1]

MILLER, Judge.

This case is before the court on defendant's renewed motion for summary judgment.[2] The issue to be decided is whether a

1. This opinion originally was issued Under Seal on February 25, 1997, and is being reissued this date at defendant's request pursuant to RCFC 52.1(b).

2. *See* order entered on October 23, 1996.

3. The drug offense at issue carried a mandatory minimum five-year prison term without possibility of parole. *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) (1994).

4. Under the key terms of this agreement, if plaintiff pled guilty to the drug offense charged, the FBI would 1) seek to persuade plaintiff's sentencing judge to defer plaintiff's sentence to allow plaintiff to furnish the FBI with informant services; 2) enroll plaintiff and his family in the federal Witness Security Program if safety concerns warranted such action; and 3) file a memorandum with plaintiff's sentencing judge detailing any "substantial assistance" plaintiff provided as an FBI informant.

plaintiff's mandatory minimum five-year jail term and sentenced him to five years on probation.

In addition to receiving a more lenient sentence, plaintiff was compensated monetarily for the informant tasks he performed. This compensation took two forms. First, the FBI gave plaintiff a lump-sum payment of $100,000.00 in exchange for his informant services. Second, plaintiff received $84,424.77 to cover the expenses that he incurred while performing informant activities.[5]

In April 1994 plaintiff filed a complaint with the United States District Court for the Eastern District of Pennsylvania.[6] Thereafter, the district court transferred plaintiff's complaint to the Court of Federal Claims pursuant to 28 U.S.C. § 1631 (1994).[7] In his complaint plaintiff alleges that the FBI breached an oral contract in which it 1) promised that plaintiff would receive up to 25 % of the money and assets seized as a result of his services; and 2) promised that plaintiff would receive an unspecified lump sum in lieu of entering the federal Witness Security Program.

Plaintiff maintains that the FBI has failed to live up to its end of the alleged bargain. Although deciphering exactly what plaintiff seeks is difficult, it appears that he claims 25% of the monies and/or properties confiscated from drug traffickers as a result of the information he furnished or $250,000.00,

whichever is less.[8] Defendant asserts that plaintiff fails to establish a material element of his claim—that the FBI special agents ("SAs"),[9] who purportedly made oral representations to plaintiff regarding payment for his informant services, had the requisite authority to bind the Government to a contract. Alternatively, defendant submits that, even if its SAs possessed the requisite authority contractually to bind the Government, the FBI has honored the terms of the purported contract. In sum, defendant argues that the $184,424.77 already paid to plaintiff satisfies the terms of this purported contract because it represents "up to 25% of" the proceeds derived from forfeitures obtained through plaintiff's assistance.

## DISCUSSION

### 1. Summary judgment standards

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence would permit a reasonable jury to

5. The FBI gave this money to plaintiff to cover the rent, utility, food, transportation, medical, and clothing costs that he incurred while working with the FBI.

6. Plaintiff's complaint alleges, as follows:

> For six years I worked with the F.B.I. under cover to help them arrest over 100 major drug dealers from Puerto Rico, New York, Miami, Philadelphia, Los [sic] Angeles, New Jersey. The F.B.I. agents told me that I would get *up to* 25 % of money, property seized. They also said that they would give me the following ...
> — new identity
> — relocation [illegible]
> — protection
> They have not complied with any of the above. I want justice to be done.

7. The Court of Federal Claims has exclusive jurisdiction over cases sounding in contract against the United States where the damages sought exceed $10,000.00. 28 U.S.C. § 1346(a)(2)

(1994). The United States District Courts have concurrent jurisdiction with the Court of Federal Claims over contract actions against the United States where less than $10,000.00 is at stake. *Id.* Plaintiff seeks more than $10,000.00; as such, jurisdiction lies with the Court of Federal Claims.

8. Plaintiff's compensation demand tracks the statute authorizing the Department of Justice Assets Forfeiture Fund, 28 U.S.C. § 524(c)(1)(C) (1994). This statute, which controls monetary rewards to informants, states that informants are entitled to no more than "the lesser of $250,000 or one fourth of the amount realized by the United States from the property forfeited." *Id.* The parties dispute the value of the assets that plaintiff's assistance helped the FBI to obtain.

9. Plaintiff named the following defendants in his complaint: The Philadelphia FBI, Special Agent in Charge ("SAC") Bob C. Reutter, Supervisor Paul Allen, and SAs Wilber V. Marsh, Edward Sims, Jerome Peters, and Joaquin Garcia.

return a verdict in favor of the non-movant. *Id.* Defendant, as the moving party, has the burden of establishing that there are no genuine material issues in dispute and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In the capacity of opposing defendant's motion, plaintiff has the burden of providing sufficient evidence, not necessarily admissible at trial, to show that a genuine issue of material fact indeed exists. *Celotex,* 477 U.S. at 322, 324, 106 S.Ct. at 2552, 2553. To create a genuine issue of fact, the non-movant must do more than present *some* evidence on an issue it asserts is disputed. As the Federal Circuit stated: " '[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence [of the nonmovant] is merely colorable, or is not significantly probative, summary judgment may be granted.' " *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1560 (Fed.Cir.1988) (brackets in original) (quoting *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted), and citing *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)).

In resolving the motion, the court cannot weigh the evidence and determine the truth of the matter on summary judgment. *Anderson,* 477 U.S. at 249, 255, 106 S.Ct. at 2510–11, 2513–14. Any evidence presented by the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2513–14. Accordingly, in his capacity as the opponent of summary judgment, plaintiff is entitled to "all applicable presumptions, inferences, and intendments." *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984).

■■■ Because plaintiff seeks contractual relief against the United States, jurisdiction over his complaint derives from the Tucker Act. *See* 28 U.S.C. § 1491(a)(1) (1994); *see also Trauma Serv. Group v. United States,* 104 F.3d 1321, 1324 (Fed.Cir.1997) ("The Tucker Act supplies the Court ... with jurisdiction for claims against the United States founded upon ... an express or implied contract."). To prove the existence of an express contract, plaintiff must show mutuality of intent to be bound "including an offer, an acceptance, and consideration." *Total Medical Management, Inc. v. United States,* 104 F.3d 1314, 1319 (Fed.Cir.1997) (citing *Thermalon Indus., Ltd. v. United States,* 34 Fed. Cl. 411. 414 (1995)); *see City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir. 1990); *H.F. Allen Orchards,* 749 F.2d at 1575; *Cruz–Pagan v. United States,* 35 Fed. Cl. 59, 60 (1996). "When the United States is a party, a fourth requirement is added: [T]he Government representative 'whose conduct is relied upon must have [had] actual authority to bind the government in contract.' " *City of El Centro,* 922 F.2d at 820 (quoting *Juda v. United States,* 6 Cl.Ct. 441, 452 (1984)) (citing *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947)). This fourth element stems from the principle that the Government, unlike private parties, cannot be bound by the apparent authority of its agents.[10] A finding of lack of authority would render the purported contract at issue unenforceable. Rather than focusing on the alleged offer, acceptance, and intent to be bound,[11] the

---

10. Apparent authority is "the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." *Restatement (Second) of Agency* § 8 (1957). This authority "is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Id.* § 27. Summarizing the inapplicability of apparent authority in the Government contract context, one judge has articulated: "[A] party contracting with the government cannot rely upon apparent authority but instead has the burden of knowing the law and ascertaining whether the one purporting to contract for the government is staying within the bounds of his or her authority." *Johnson v. United States,* 15 Cl.Ct. 169, 174 (1988).

11. Confusion abounds over several material facts relating to the formation of the alleged contract. For example, defendant claims that the FBI never offered plaintiff up to 25% of the proceeds

court therefore concentrates on the existence *vel non* of authority. To this end, the court must determine whether plaintiff has submitted sufficient evidence to establish a disputed issue of fact as to whether the FBI SAs with whom he allegedly dealt had authority contractually to obligate the Government. *See H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed.Cir.1989) (limiting inquiry to whether government officials possessed binding authority); *Hoch v. United States,* 31 Fed. Cl. 111, 114 (1994) ("An agent of the United States cannot bind the Government absent actual authority to contract.").

## 2. *Express actual authority*

 Government employees have express actual authority contractually to bind the Government only when the Constitution, a regulation, or a statute grants such authority in an unambiguous manner. The authority of FBI agents to make payments to informants is governed by the FBI Field Office Manual of Investigative Operations and Guidelines & Administrative Operations and Procedures (undated) (the "Manual"), which was in effect during plaintiff's tenure as an informant.[12] Of importance to this court, the Manual dictates that the Special Agent in Charge (the "SAC") or, in the SAC's absence, the Assistant Special Agent in Charge (the "ASAC"), is authorized to pay informants up to $5,000.00.[13] Manual § 6–11(1).[14] Once this threshold limit is reached, the SAC or, in the SAC's absence, the ASAC must request and obtain additional payment authority from FBI headquarters ("FBIHQ") before making further informant expenditures. *Id.* § 6–11(2). In emergency situations, the requirement of obtaining written FBIHQ approval gives way and oral FBIHQ authorization will suffice. *Id.*

The record is devoid of any evidence suggesting that the SAs with whom plaintiff purportedly contracted had authority to commit the FBI to make payments in any amount to an informant. Nor is any indication present that the SAs obtained SAC approval for payments less than $5,000.00.[15] Similarly, no indication is present that Mr. Reutter, the lone SAC named in plaintiff's complaint, obtained FBIHQ approval for payments to plaintiff exceeding $5,000.00. Plaintiff has failed to come forward with any evidence suggesting that the named SAs had authority or obtained the authorization required in order to make their purported promises binding. Accordingly, these SAs lacked the requisite express actual authority necessary to form an enforceable contract with plaintiff.[16]

---

stemming from forfeitures attained with plaintiff's cooperation. The court's finding on authority renders resolution of the issues surrounding offer, acceptance, and consideration unnecessary.

12. Pursuant to Judge Robinson's order entered on October 8, 1996, defendant submitted excerpts of the Manual.

13. The court discloses this $5,000.00 figure because Judge Robinson and defense counsel both revealed the SAC's payment authority in open court on the record. Transcript of Proceedings, *Roy v. United States,* No. 95–319C at 10 (Fed.Cl. Aug.1, 1996) ("Tr.").

14. These provisions were effective August 30, 1991.

15. Plaintiff attempts to overcome this finding by attaching particular significance to a $10,000.00 payment that he received on August 6, 1993. Reviewing the receipt evidencing this payment, which was signed by SA Jerome Peters and another FBI SA whose name is illegible, it appears that the payment was made in exchange for informant-related services provided by plaintiff on August 3, 1993. Although difficult to discern from his papers, plaintiff apparently contends that because SA Peters physically handed this payment to him, SA Peters and all other FBI SAs must have express actual authority contractually to bind the Government. Plaintiff misses the point. The mere fact of payment does not clothe the person remitting the payment with authority to bind the Government in contract.

Defendant takes the position that plaintiff was paid $100,000.00; it does not dispute the $10,-000.00 payment for purposes of summary judgment. Whether plaintiff was paid $100,000.00 or $110,000.00 is not material to resolution of defendant's motion.

16. In support of its contention that the agents with whom plaintiff purportedly contracted lacked the requisite express actual authority to bind the Government, the FBI offers the declaration of James J. Jasinski, the FBI's designated Contracting Officer. Mr. Jasinski states:

2. In my position as Unit Chief of the Contract Review Unit, I am designated Contracting Officer for the FBI. As such, I am authorized

### 3. *Implied actual authority*

 Plaintiff contends that even if none of the agents with whom he dealt possessed express actual authority contractually to obligate the Government, those agents could bind the FBI under the doctrine of implied actual authority.[17] "Authority to bind the Government is generally implied when such authority is considered to be an integral part of the duties assigned to a Government employee." *H. Landau & Co.*, 886 F.2d at 324 (quoting John Cibinic, Jr. & Ralph C. Nash, *Formation of Government Contracts* 43 (1982)). The word integral has been interpreted to mean "essential" or "necessary to form a whole." *See Cruz–Pagan*, 35 Fed. Cl. at 61 (using dictionary definition of integral for purpose of determining whether government agency impliedly authorized its field agents to contract with informant). In order to withstand summary judgment, plaintiff must raise a genuine dispute as to whether contractually binding authority is necessary or essential to the successful performance of FBI SAs' duties.

To substantiate his claim that implied authority attaches to the facts of this case, plaintiff argues that informants play important roles in FBI investigations and that the FBI therefore needs informants. Plaintiff also asserts that the FBI almost always compensates informants in order to induce their cooperation. Because FBI SAs are responsible for locating, developing, and controlling informants, plaintiff reasons that the FBI must expect its SAs to execute compensation agreements with informants in order to entice them to perform services for the FBI.

Defendant counters that contractual authority is not essential to the successful performance of SAs' informant-related duties. Defendant cites *Cruz–Pagan* as dispositive of the instant action. Plaintiff in *Cruz–Pagan*, a former Drug Enforcement Administration (the "DEA") informant, brought a contract action against the Government, alleging that certain DEA field agents breached their promises to pay him 25% of the proceeds of forfeitures acquired with his assistance. On defendant's motion for summary judgment, the court found that the field agents in question lacked implied actual authority to bind the DEA. This finding was grounded on two alternative bases.

First, the court reasoned that DEA field agents could perform their assigned tasks, which included "maintaining contact" with and "exercising control over" informants, without possessing actual contracting authority. 35 Fed. Cl. at 61. Such authority was not integral to the successful performance of DEA field agents' informant-related duties,

to enter into and administer contracts on behalf of the FBI and make determinations and findings related to contracts entered into by the FBI. My authority to act in this capacity is set forth in Title 48, Code of Federal Regulations, Sections 1.601 and 1.602.

3. I have reviewed plaintiff's Complaint in the captioned matter. At no time do I recall having reviewed, approved, or certified any contract on behalf of the FBI with the plaintiff, other than those for which plaintiff has been paid in full, the promised consideration. To the best of my knowledge, the FBI has never entered into a contractual relationship with the plaintiff for monies or property beyond those that have already been paid. A review of our contract records indicates that no such additional contract exists.

4. I am generally familiar with the facts that give rise to plaintiff's claim, as those facts were made known to me by the FBI's Office of the General Counsel. Based on a review of those facts, I am aware that plaintiff is alleging that the FBI employees who contracted with the plaintiff for additional payments are Special Agent in Charge Bob C. Reutter, Supervisory Special Agent Paul D. Allen, Jr., Supervisory Special Agent Jerome D. Peters, and Special Agent Joaquin Garcia.

5. I maintain a list of all FBI employees who currently have or used to have contracting authority, and a review of that list does not indicate that any of the Special Agents referenced in Paragraph No. 4 had contracting authority to enter into any contract or contracts between the FBI and plaintiff.... above and beyond that for which plaintiff ... has already been paid.

Declaration of FBI Contracting Officer James J. Jasinski, dated Aug. 14, 1995, ¶¶ 2–5. This showing is unavailing to defendant because it does not address whether the named SAs obtained authority pursuant to section 6 of the Manual, especially section 6–11.

17. Plaintiff's brief does not explicitly make this argument. Nonetheless, in light of plaintiff's *pro se* status and in an effort to illuminate the record, the court will address the application of implied authority to this case. *See Roche v. USPS*, 828 F.2d 1555, 1558 (Fed.Cir.1987) (construing *pro se* plaintiff's argument liberally).

because "reasonably efficient alternatives" existed to persuade potential DEA informants that they would receive compensation in exchange for their assistance. Specifically, instead of granting their field agents contractually binding authority, the DEA could encourage informant cooperation by establishing procedures to 1) provide field agents' supervisors with authority to pre-approve field agent requests for funds to make payments to informants; and 2) make compensation to informants contingent on receipt and valuation of information. The court concluded that the DEA's adherence to the latter of these payment mechanisms was sufficient to entice potential informants to cooperate with the DEA. This payment procedure thus obviated the need for DEA field agents to have contracting authority.

Like the DEA field agents in *Cruz–Pagan*, the SAs in the instant action are responsible for developing and supervising confidential informants. Manual § 137–2(3). Implying that FBI SAs possess actual contracting authority is not essential to ensure that FBI SAs successfully exercise their informant-based responsibilities. Rather, as the court in *Cruz–Pagan* found, "reasonably efficient alternatives" enable FBI SAs to develop and control informants without having authority contractually to bind the FBI. Much like the DEA agents in *Cruz–Pagan*, the FBI SAs in the present case can achieve their goal of inducing informant cooperation by following established Manual payment procedures. *See* Manual § 6–11(2) (requiring SAC to obtain prior FBIHQ approval for payments exceeding $5,000.00); *id.* § 137–10(6)(b) (requiring SAC to furnish FBIHQ with justification request for lump-sum payment approval). For these reasons, contracting authority is not essential or necessary for FBI SAs to effectively perform their tasks of developing and controlling informants.[18] Because contracting authority is not integral to FBI SAs' informant responsibilities, the doctrine of implied actual authority is inapplicable to the facts of the case at bar.[19]

The second basis on which the court in *Cruz–Pagan* relied to reject the application of implied actual authority was the DEA Agent Manual. Section 6612.45 of this DEA Manual sets forth the DEA's policy of compensating informants, as follows:

> C. *Award Payments*
>
> 1. [T]he [SAC] or Country Attache may approve payments up to $25,000 per quarter; the Deputy Assistant Administrator for Operations ... may approve amounts beyond $25,000.... The Attorney General may delegate authority to the Administrator to approve an award in excess of $250,000.
>
> 2. Offices [sic] must not promise any award in any amount to any individual.

*Cruz-Pagan*, 35 Fed. Cl. at 62.

As the court emphasized, this internal regulation granted payment authority to speci-

---

18. Plaintiff's case for implied actual authority would have been stronger if SAC Reutter promised or approved the payment that plaintiff seeks. This is because a finding of implied actual authority is predicated on the existence of some express actual authority. *See Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 694 (endorsing proposition that implied actual authority can only attach to actions of government officials with some amount of express actual authority), *dismissed*, 36 F.3d 1111 (1994) (Table); *Garza v. United States*, 34 Fed. Cl. 1, 20 (1995) ("Before any implied authority can exist ... some express authority must first exist upon which the implied authority can be based."). As the Manual indicates, SAC Reutter had express actual authority to make and approve payments, up to a limited amount, to informants. Manual § 6–11(1). Moreover, SAC Reutter had the ability to request additional payment authority from FBIHQ. *Id.* § 6–11(2). The court is precluded from implying authority to SAC Reutter, however, because

plaintiff has come forward with no evidence linking SAC Reutter to the contract that plaintiff seeks to enforce. Queried by Judge Robinson, plaintiff said he never had any direct contact with SAC Reutter, Tr. 17–18, nor does plaintiff allege that the SAC somehow approved the purported contract and sought payment authority from FBIHQ.

19. This finding applies to and bars plaintiff's federal Witness Security Program claim. Plaintiff alleged that SAs Marsh and Sims promised him a lump-sum cash payment if plaintiff agreed to not enter the Witness Security Program. As demonstrated above, SAs lack the requisite authority (express and implied) to execute such contracts on the FBI's behalf. Given this holding, any promises that SAs Marsh and Sims may have made to plaintiff cannot bind the Government.

fied DEA officials. All other DEA agents, including the field agents with whom the plaintiff in *Cruz–Pagan* dealt, were subject to the prohibition encased in Manual Sec. 6612.45.C.2 and could "not promise any award in any amount to any [informant]." 35 Fed. Cl. at 62.

Unlike the DEA Manual in *Cruz–Pagan*, the FBI Manual in the instant matter contains no express provision precluding FBI SAs from making compensation agreements with informants. Although *Cruz–Pagan* is distinguishable from this case, as defendant aptly notes, this is a "distinction without a difference." Def's Br. filed Nov. 21, 1996 at 21. The FBI's informant payment regulations, which are embodied in the Manual, vest only certain FBI officials with authority to make enforceable compensation promises, up to a limited amount, to informants. These regulations also detail the formal steps that must be taken before such funds can be committed. None of these provisions authorizes SAs to make contractually binding compensation promises. As defendant persuasively argues, this non-inclusion is analogous to the specific exclusion discussed in *Cruz–Pagan*. "Because [the FBI] adopted procedures that ... preclude [SAs] from exercising contracting authority, it simply is not reasonable to imply that [the FBI] granted or delegated such authority to its [SAs]." *Cruz–Pagan*, 35 Fed. Cl. at 62.

### 4. *Effect of payment already received*

 Assuming, *arguendo*, that the SAs had the requisite authority to render plaintiff's purported contract enforceable, the plain meaning of the words of plaintiff's contract support the conclusion that plaintiff is entitled to no more compensation than the amount he has already received. Contract interpretation is a legal matter resolvable by summary judgment. *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984); *Shearson Lehman Hutton, Inc. v. United States*, 24 Cl.Ct. 770, 773 (1991) ("[I]ssues ... [that] are solely matters of contract interpretation ... are

consequently appropriate subjects for summary judgment."), *aff'd*, 983 F.2d 1086 (Fed. Cir.1992). When interpreting a contract's terms, the court determines what the parties intended when forming the contract. *SCM Corp. v. United States*, 230 Ct.Cl. 199, 203, 675 F.2d 280, 283 (1982). To achieve this end, the court must "interpret the provisions of the unambiguous contract ... so that the words of those provisions are given their plain and ordinary meaning." *George Hyman Const. Co. v. United States*, 832 F.2d 574, 579 (Fed.Cir.1987). The touchstone to this inquiry is to determine whether the contract's terms are unambiguous. Contractual terms are unambiguous if they are susceptible to only one reasonable interpretation. *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1544 (Fed.Cir.1993). If the contract in question is unambiguous, the court will use the contract's plain meaning to determine the parties' rights and obligations. *Elden v. United States*, 223 Ct.Cl. 239, 252, 617 F.2d 254, 260–61 (1980).

Plaintiff repeatedly has stated that the contract he seeks to enforce entitled him to "up to 25% of all forfeiture proceeds which resulted from [his] direct assistance." Declaration of Rob Roy, dated Nov. 8, 1995, ¶ 2 (emphasis added); *see* Tr. at 27–28 (restating claim to up to 25% of confiscated property's value). This contractual language is unambiguous. It entitled plaintiff to an unspecified amount of money derived from the forfeiture proceeds that he helped the FBI to procure. On September 30, 1993, the FBI paid plaintiff $100,000.00 or $110,000.00, *see supra* note 14, in exchange for his services. In so doing, the FBI complied with the contract's plain language. This $100,000.00 payment satisfied the contract because it fell within the range of "up to 25% of" all assets that plaintiff's assistance enabled the FBI to acquire. The total monetary amount that the FBI seized through plaintiff's assistance thus is not in issue—so long as the FBI gave plaintiff some money, it paid "up to 25% of" plaintiff's claim.[20]

---

20. The parties disagree over the value of the forfeited assets that plaintiff's assistance helped the FBI obtain. Defendant puts forth the sum of $1.82 million, and plaintiff counters with a figure of $5 million. The court's finding that the FBI complied with the purported contract by remitting any amount of money to plaintiff makes resolution of this factual dispute unnecessary.

192

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment is granted. The Clerk of the Court shall enter judgment dismissing the complaint.

**IT IS SO ORDERED.**

No costs.