**Antonio C. GAMBINO, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 98–787C.**

United States Court of Federal Claims.

Aug. 4, 2000.

William L. Boyd, Trenton, NJ, for plaintiff.

Lisa B. Donis, Washington, DC, with whom was Acting Assistant Attorney General David W. Ogden, for defendant.

## ORDER

MILLER, Judge.

This case is before the court after trial on the merits. It involves the contractual relationship between the Federal Bureau of Investigation (the "FBI") and an informant in the context of an undercover stolen-goods buying operation. One year into the initial operation, having obtained the information and evidence necessary to indict two criminal operators, the FBI closed down the project and moved, without deliberate speed, to deescalate plaintiff's commitment. Plaintiff, however, sought to continue his work and entertained the unprovoked fantasy of a lasting contractual relationship. Trial revealed that plaintiff was paid amounts within the contract's discretionary range throughout the period at issue. Because these payments satisfy the contract requirements, plaintiff is not entitled to relief.

## FACTS

On an undetermined date in 1991, Antonio C. Gambino ("plaintiff") began providing the FBI, through Special Agent Douglas S. Riggin, with information about various criminal operators in and around the Trenton, New Jersey area. Consistent with FBI procedure, Agent Riggin assigned plaintiff a code name in order to protect plaintiff and maintain the credibility of FBI operations with which plaintiff was involved.[1] On July 30, 1992, Agent Riggin formally opened plaintiff as a "confidential informant." For the information that plaintiff brought to the FBI, he was paid on an *ad hoc* basis, in varying cash payments consistent with Agent Riggin's assessment of its value, as required by FBI procedure. Despite plaintiff's continuing requests to be put under contract with regular payments, this fee arrangement continued unabated until May 10, 1994. Plaintiff was also reimbursed in cash for all expenses incurred in furtherance of his information-gathering activities, conditioned on the presentation of receipts. Upon payment for services or expenses, plaintiff was required to sign, using his code name, receipts presented by Agent Riggin indicating plaintiff indeed had received the money.

In early 1993 Agent Riggin developed a plan to apprehend through an undercover stolen-goods buying operation a number of Trenton's criminal operators specializing in interstate commerce of drugs, illegal weapons, and stolen vehicles. The stolen-goods buying operation established by Agent Riggin was called "Truck One International" and was characterized by the FBI as a "Group II Undercover Operation," signifying that it was "nonsensitive." Agent Riggin instructed plaintiff to rent a small dwelling in Trenton with an office and a garage to house Truck One International, to purchase furniture and appliances, and to lease gaming equipment to attract criminal operators. Agent Riggin supervised plaintiff in these endeavors and approved in advance all major decisions concerning Truck One International. In furtherance of the objectives of the operation, on December 27, 1993, Agent Riggin converted plaintiff's status from confidential informant to "cooperative witness." The responsibilities of a cooperative witness are the same as those of a confidential informant, with the additional obligation to testify, if asked to do so, in a court of law against the target of an investigation.

Throughout the operation of Truck One International, plaintiff continued to protest that his payments were too irregular and not equivalent to the value of his services. Perhaps as a result of his persistence, Agent Riggin put plaintiff under a written agreement for plaintiff's services which was signed on May 10, 1994. This was the only personal services contract that Agent Riggin had drafted and administered. He cut and paste the bulk of the language used from FBI form contracts.[2] Paragraph 3 of the agreement states:

1. A trial anecdote concerning the evolution of plaintiff's code name "NOID" bears retelling. At trial plaintiff *consistently* referred to and pronounced his code name "No I.D."—a shorthand for "no identification." However, Agent Riggin testified that, in fact, plaintiff's code name was

understood to be and always pronounced "noid,"—a shortening of "paranoid," a characterization consistent with the FBI's assessment of plaintiff's emotional stability.

2. The problems with this contract were not attributable to Agent Riggin; rather, the FBI mod-

3. In return for his cooperation the FBI will provide GAMBINO with compensation, on a cash on delivery basis, in an amount of up to $1,500.00 per month, with the amount of such payments at the discretion of the FBI. All applicable taxes associated with these earnings will be the responsibility of GAMBINO.

Despite the discretionary language "up to" conditioning "$1,500.00 per month," plaintiff consistently testified that Agent Riggin promised him the full $1,500.00 each month. Agent Riggin denied that plaintiff had been so promised. Paragraph 14, governing the duration of the agreement, states:

14. This agreement shall commence on the date of acceptance by GAMBINO as signified by his signature, and shall continue as long as the FBI deems that GAMBINO's services are required. It [sic] extension beyond 9/30/94 is contingent upon congressional approval of the necessary funding. It may be terminated at any time by either party by deliverance of written notice to terminate.

Group II Undercover Operations like Truck One International are limited by FBI guidelines to a six-month period of operation. Thereafter, the operation may be renewed by the case agent for another six-month period only once without more formal review and approval. After being renewed once by Agent Riggin, Truck One International was closed down in May 1995.[3] As a result of evidence obtained by Truck One International, two criminal operators were indicted. Plaintiff's efforts during the operation were by all accounts competent and productive. He regularly interacted with criminal operators in dangerous situations and recorded many conversations for the FBI. He also worked seven days a week, sometimes for long hours, and was always diligent in reporting to Agent Riggin. During the period that Truck One International operated, plaintiff was paid $1,500.00 each month for his services—the maximum amount allowable under the contract.[4]

For the period immediately following the close of Truck One International in Trenton, plaintiff's testimony is entirely irreconcilable with the events as related by the FBI agents. Agent Riggin testified that he explained to plaintiff in no uncertain terms that the operation was over, and, because there was no prospect of renewing it, he orally terminated plaintiff's contract. In the wake of the Trenton operation, plaintiff apparently had become very concerned about his safety. As justification for his fear, plaintiff cited a host of dubious incidents to Agent Riggin, including dead fish heads found in the fountain behind his home and cinder blocks thrown through his front windows.[5] Although he did not believe these stories, or that plaintiff was in danger, Agent Riggin indulged plaintiff's fears and, eventually, was able to obtain $3,300.00 to help relocate plaintiff. To Agent Riggin's dismay, rather than moving to the South, as they had discussed many times, plaintiff relocated to Florence, New Jersey— a mere seven miles from Trenton.

After his move to Florence, Agent Riggin told plaintiff that he was free to continue to uncover useful information in the hopes of being compensated on an *ad hoc* basis, but that, at this point, no justification was present for opening another FBI operation, that he could not expect the FBI's support, and that Agent Riggin did not have the time to devote to a joint effort on the order of the Trenton operation. Plaintiff continued to provide information concerning gambling and stolen vehicles, but not as part of an undercover operation. Agent Riggin communicated frequently with plaintiff during the follow-

---

el contracts were inadequate to the task of binding the parties to a coherent agreement.

3. Agent Riggin testified that he had told plaintiff on many occasions that the operation would not continue beyond that date.

4. Initially plaintiff was paid only once per month. However, in light of plaintiff's apparent money-management problems, Agent Riggin soon changed to bi-weekly payments.

5. The court also heard testimony about an incident during which the police in a nearby community were called upon to respond. Upon being questioned about his injuries, plaintiff claimed that CIA operatives had hit him on the back of the head with a gun and abducted his brother. However, it was unclear whether that event occurred during this time period.

ing months and was able to obtain funds to pay plaintiff for some of the information he provided, although the payments never again reached the contract's limitation $1,500.00 per month. Agent Riggin testified that in retrospect he was too generous with plaintiff and should have either paid him much less or simply terminated the relationship. On July 17, 1996, Agent Riggin left the FBI's Trenton office.

Plaintiff relates a completely different story. Upon the closing of the Trenton location, plaintiff denies that Agent Riggin orally terminated his contract or explained that the operation was at an end. To the contrary, plaintiff testified that Agent Riggin then directed him to find a suitable site to relocate Truck One International in the area and gave him $3,300.00 for this purpose. Plaintiff, after some searching, found the Florence location and proceeded to outfit it, as the Trenton location had been, in consultation with Agent Riggin. Thereafter, the two essentially continued the undercover stolen-goods buying operation. Having been promised no less than $1,500.00 per month, plaintiff questioned Agent Riggin on numerous occasions about the now-erratic payment schedule. According to plaintiff, Agent Riggin responded that "we ran out of money" and that plaintiff would recover the amounts owed when the financial situation improved. Signed receipts show that plaintiff was paid for services and to reimburse him for expenses. Plaintiff alleges that a substantial portion of the payments for which signed receipts were produced was never received— plaintiff sometimes having been asked by Agent Riggin to sign blank documents and the signatures on others being outright forgeries. This particular allegation was totally contradicted by the testimony of both Agent Riggin and Special Agent Matthew Roberto, whose signature frequently appeared as the witness on these receipts.

After Agent Riggin's departure from the Trenton office, Agent Roberto became plaintiff's supervising agent. Plaintiff's already dwindling payments then ceased. On March 14, 1997, Agent Roberto closed plaintiff as a cooperative witness.

Plaintiff brought suit to recover $1,500.00 per month for his services for the period May 1995 to July 1996,[6] less amounts already received for services. This total includes payments for which receipts exist which allegedly were forged. Plaintiff also seeks compensation for his expenses for the same period. On November 22, 1999, the court denied defendant's motion for summary judgment due to disputed factual issues concerning whether plaintiff had been paid for services. *See Gambino v. United States*, 45 Fed.Cl. 276, 279 (1999) (*"Gambino I"*). The court denied a second motion on the same grounds. *See Gambino v. United States*, No. 98–787C (Fed.Cl. Feb. 24, 2000) (*"Gambino II"*).

## DISCUSSION

### 1. Contract termination

Plaintiff seeks to recover payment for services allegedly guaranteed under the contract after the Trenton operation was closed in May 1995. Defendant protests that plaintiff's contract was terminated orally by Agent Riggin and did not survive past May 1995. Plaintiff counters that the contract required written termination; therefore, even assuming that the court believes Agent Riggin's testimony, an oral termination was inoperative.

A contract "must be considered as a whole and interpreted so as to harmonize and give meaning to all of its provisions." *Arizona v. United States*, 216 Ct.Cl. 221, 235, 575 F.2d 855, 863 (1978). To effectuate this purpose, the court must "interpret the provisions of the unambiguous contract ... so that the words of those provisions are given their plain and ordinary meaning." *George Hyman Constr. Co. v. United States*, 832 F.2d 574, 579 (Fed.Cir.1987); *see also SCM Corp. v. United States*, 230 Ct.Cl. 199, 203, 675 F.2d 280, 283 (1982). The touchstone of this inquiry is determining whether the contract's terms create an ambiguity.

---

6. The complaint seeks relief through March 19, 1997. However, the parties' pretrial briefs both indicate that the period in question is more limited. *See* Plf's Br. filed July 13, 2000, at 2; Def's Br. filed July 11, 2000, at 2.

*See Northrop Grumman Corp. v. Goldin,* 136 F.3d 1479, 1483 (Fed.Cir.1998); *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1434–35 (Fed.Cir.1996). "A contract is ambiguous if it is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language." *Community Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1579 (Fed. Cir.1993) (citations omitted). If, given this analysis, contract terms are unambiguous, the court cannot assign another meaning, no matter how reasonable it may appear. *See Triax Pacific, Inc. v. West,* 130 F.3d 1469, 1473 (Fed.Cir.1997) (citation omitted).

■ Paragraph 14 of the contract, governing the duration of the agreement, states:

14. This agreement shall commence on the date of acceptance by GAMBINO as signified by his signature, and shall continue as long as the FBI deems that GAMBINO's services are required. It [sic] extension beyond 9/30/94 is contingent upon congressional approval of the necessary funding. It may be terminated at any time by either party by deliverance of written notice to terminate.

Plaintiff's position is that the third sentence of the paragraph unambiguously requires a writing to terminate the contract. Defendant contends that the first sentence of the paragraph implicitly gives the FBI the unilateral right to terminate the agreement and does not limit the method by which termination may be effected. Thus, the argument goes, the first sentence operates as a condition on the third sentence, excepting the FBI from the requirement that termination be in writing, or at least creates an ambiguity in the document. The court disagrees. The first sentence indicates only the conditions under which the FBI may terminate the agreement—namely, at its unilateral determination. It does not address the permissible methods of termination, a topic left exclusively to the third sentence.

Defendant further argues that the second sentence, containing the congressional funding contingency, automatically terminates the agreement on a certain date without FBI action. The court does not disagree that the second sentence seeks to create an automatic termination contingency; however, in this context, the congressional funding contingency simply makes no sense. Congress does not approve specific agreements with, or cash payments to, confidential informants or cooperative witnesses. Funding for these endeavors emanates from the FBI's internal budgeting process. The sentence arguably might make continuation of the agreement contingent upon a certain level of congressional funding to the FBI generally. However, as the term "necessary funding" is not defined, and otherwise indeterminate, the court declines to read in such a limitation.

Finally, defendant's reading is objectionable because it necessitates that the court excuse the FBI from the requirement of the final sentence which states explicitly its application to "either party." Because the contract is unambiguous as to methods of termination, Agent Riggin's oral termination was inoperative.

### 2. *Performance*

■ Plaintiff seeks to recover the maximum amount allowable under the contract for services performed for the period May 1995 to July 1996. Defendant argues that the FBI satisfied the contract requirements by making discretionary cash payments for services in amounts of less than $1,500.00 per month. Plaintiff counters that Agent Riggin promised him the maximum $1,500.00 per month and, alternatively, that many payments were never made, because his signatures on the receipts were forged.

As resolved in this court's interim rulings denying defendant's summary judgment motions, the contract only required that plaintiff be compensated an amount not to exceed $1,500.00 per month for services; no minimum payment was required. *See Gambino II,* at 4. The FBI therefore had discretion to pay plaintiff an amount less than $1,500.00, as long as payment was made in some amount. The court noted the close parallel of this case with *Roy v. United States,* 38 Fed.Cl. 184, *appeal dismissed,* 124 F.3d 224 (Fed.Cir.1997). In *Roy* the FBI contracted to pay an informant up to 25% of forfeiture proceeds recovered by virtue of his assis-

tance. The Government argued that plaintiff's FBI handler lacked the requisite authority to bind the Bureau, but that, in any event, the FBI had fulfilled the promise by making a lump-sum payment of $100,000.00 to him. This court interpreted the contract language, as follows:

> This $100,000.00 payment satisfied the contract because it fell within the range of "up to 25% of" all assets that plaintiff's assistance enabled the FBI to acquire. The total monetary amount that the FBI seized through plaintiff's assistance thus is not in issue—*so long as the FBI gave plaintiff some money, it paid "up to 25% of" plaintiff's claim.*

*Id.* at 191 (emphasis added). In *Gambino II* this court applied its own reasoning in *Roy* that, while the Government was free to pay plaintiff any amount less than the stated figure, it was still required to pay plaintiff some amount. *See Gambino II* at 4. This analysis is consistent with the plain language of the contract in the case at bar that gives the FBI significant discretion in fixing the level of payment, but nevertheless contemplates some payment for services.

Application of the law therefore turns on a determination of credibility—an analysis under which plaintiff does not fare well. Plaintiff's contention that Agent Riggin promised him the full $1,500.00 per month was refuted by Agent Riggin and contravenes the explicit language of the signed contract. Diminished payment amounts after May 1995 coincide with the closing of the Trenton operation and are consistent with the de-escalation of plaintiff's commitment that Agent Riggin attempted to achieve. This chain of events cannot be reconciled with the scenario offered by plaintiff concerning a continued operation in Florence. Moreover, the other evidence of record does not corroborate plaintiff's bare testimony. Plaintiff's contention that he received little of the money because of rampant receipt forgery is not credible. Both Agent Riggin and Agent Roberto categorically refuted the assertion that they presented plaintiff with blank receipts and filled in amounts, characterization of amounts, and witness signatures at a later time. Apparently, clerks at the FBI's New-

ark office enter the amount paid and its characterization before a receipt is sent to the Trenton supervising agent. Plaintiff's scenario, which requires the court to infer a pattern of widespread forgery and deceit not limited to Agent Riggin, but encompassing employees at all levels in both the Trenton and Newark offices, is too farfetched to garner judicial endorsement.

## CONCLUSION

The payments made by the FBI to plaintiff after May 1, 1995, for services satisfied the contract requirement that plaintiff receive "up to $1,500.00 per month" for such services. Accordingly, based on the foregoing,

The Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED.**

No costs.